**In re STACEY S. et al.**

[Cite as *In re Stacey S.* (1999), 136 Ohio App.3d 503.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–98–1213.

Decided Dec. 30, 1999.

504

*Jane S. Randall,* for appellants.

*Patricia J. Clark,* for appellee.

SHERCK, Judge.

This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, Juvenile Division. It involves the termination of parental rights and granting of permanent custody of six minor children to a children's services board. Because we conclude that the trial court improperly denied the children an attorney, we reverse.

### Family Intervention

Appellants, James S. and Terri B., are the parents of six children: twelve-year-old Stacey S., ten-year-old Stephanie S., and two sets of twins: Jennifer and James B., age nine, and Rachel and Rebecca S., age eight.

In 1995, the family lived in an East Toledo house that they were purchasing on land contract. Although the house was in substantial disrepair, renovations were being performed as the family could afford.

In late 1995, Rachel, then age five, injured her arm and required surgery. This was the third time Rachel required medical treatment. She injured the same arm approximately one year earlier. She had also injured herself in another instance when, according to her parents, she had fallen while straddling the edge of a bathtub. The prior incidents had been investigated by appellee, Lucas County Children's Services Board, but no action was taken.

Rachel's 1995 surgery required follow-up care by the physician. The parents scheduled an appointment with the physician for this visit. They could not keep the appointment because, according to appellants, their car broke down and they could not afford to fix it. The parents testified that they called the physician's office and rescheduled. They were, however, still unable to make an alternative time. It is not clear from the record whether appellants attempted to again reschedule or simply missed the follow-up appointment. Whatever the circumstances, the missed appointment resulted in a referral, apparently by the surgeon's office, to children's services.

On January 5, 1996, appellee sent a social worker to appellants' home to investigate the missed appointment. While the social worker was in the home, appellant James S., surmising that the physician's office was responsible for the referral, called the doctor's office and spoke to a receptionist in a threatening manner. The receptionist called 911 to report the call.

In the meantime, the social worker was interviewing five-year-old Rachel and six-year-old Jennifer, both of whom reported that their father drank beer and, on occasion, yelled at and hit their mother. By *ex parte* order, the children were removed from the home the same day.

On January 8, 1996, appellee filed a dependency and neglect complaint and moved for a shelter care order. The complaint listed as cause for the removal the missed doctor's appointment, the children's statement of domestic violence and alcohol in the home, the "suspicious * * * nature" of Rachel's injuries, appellant father's alleged cocaine abuse, his "diagnosed * * * antisocial personality disorder," his "loud, defiant and bombastic manner," and his "open hostil[ity] toward L.C.C.S.B." Appellant mother was alleged to be, "unable or unwilling to protect herself from [appellant father]." Additionally, the complaint reported that when examined upon removal from the home, one of the children had a genital abnormality which, "could be consistent with sexual abuse." On the same day, at a shelter care hearing, appellant mother appeared without counsel and consented to appellee's temporary custody of the children. Following the hearing, a magistrate appointed a guardian *ad litem* for the children and ordered a psychological evaluation for appellants and a sexual abuse screening for the children.

During the next week there was some negotiation between appellants and appellee. With the apparent agreement of appellee, appellant Terri B. persuaded her own mother to come from Texas and move into the family home, with the view that placement of the children might be made with her. On February 14, 1996, appellants consented to an adjudication of neglect and dependency for all the children and further consented to their continued temporary custody with appellee.

Following certain repairs to the family home mandated by appellee, the children were placed with their maternal grandmother in the home. Appellants were ordered not to visit the family home and their access to the children was restricted to a one hour, once a week supervised visitation at children's services.

The relationship between the family and appellee agency was never smooth. At the first supervised visitation, appellant father engaged in an obscenity-laced quarrel with an agency overseer because someone had cut one of the girl's long hair. Later in the day, appellant father was arrested on outstanding misdemeanor warrants while attending a case-planning meeting. Some months later,

another loud and obscenity-laden confrontation occurred between appellant father and another visitation supervisor over a visit cut short to accommodate a foster parent. Appellant father's language and loud and abrasive behavior are reoccurring themes in these proceedings.

The children's maternal grandmother also clashed with children's services when she accused them of reneging on a promise to provide her with respite assistance. When she complained to the agency's ombudsman, the social worker assigned to the family told the ombudsman that the grandmother had declined services. The grandmother vehemently denied this assertion during the dispositional hearing. At issue was whether the grandmother had permitted appellant mother to visit the children in the home in violation of the case plan. According to the grandmother, she asked the agency to fulfill their promise for some part-time respite care or, in the alternative, to permit her daughter, appellant mother, to aid her. Only after the agency refused, according to the grandmother, did she let her daughter occasionally help at the family home.[1] When appellee discovered this, the children were removed from their grandmother's care and placed in three different foster homes.

## The Family

Appellant father is the son of a police officer and, by his account, a prostitute. He is an elementary school dropout who spent much of his youth in a county children's home (where he reports he was sexually molested) or in the custody of the juvenile justice system for numerous delinquency offenses. This criminal activity continued into adulthood resulting in his being twice imprisoned for theft related offenses. Appellant father also has the uncanny ability to say the wrong thing and do the wrong thing at exactly the wrong time. Psychologists who spoke to him characterized this as an antisocial personality or an oppositional disorder. Appellant father calls it "going off" and admits he has difficulty controlling these episodes.

This trait manifested itself frequently throughout the case. Initially, it was exhibited in the ill advised, threatening call to the physician whom appellant believed reported him for missing an appointment. This vocal bluntness continued in virtually every contact he had with the representatives of appellee agency. The agency's initial complaint characterized appellant father as "openly hostile" to children's services, stating that he bragged of his criminal activity and extensive drug use. He was further reported to have muttered obscenities under his breath during court hearings. Referred to a domestic violence offender's

---

1. The grandmother characterizes the frequency of these visits as minimal. She also conceded that on one occasion both appellants were at the house.

group, appellant father tore up a pretest administered to the group. When given a second pretest, he wrote an obscenity on it and threw it on a table. Appellant father was asked to leave the group when he refused to sign a confidentiality agreement. He was later barred from the facility following an incident in which he grabbed his crotch and directed obscene language at an evaluating psychologist. This activity occurred in spite of the fact that both parents had previously told the same psychologist that they would do "whatever it took" to get the children back.

The picture of appellant mother in this affair is mostly derived from her posture relative to the father. She is characterized as standing by and doing nothing to control appellant father's inappropriate behavior. She concedes that there was once domestic violence between the father and her, but insists that it is in the past. She denies that either she or the father has a substance abuse problem, but admits that both use marijuana occasionally. When referred to substance abuse treatment, domestic violence counseling and parenting classes, she attended some sessions, but did not complete any of the programs. Appellant mother rejected an agency suggestion that she leave appellant father so that she could maintain custody of the children.

### Guardian ad litem/Attorney

At the outset of the case, a guardian *ad litem* was appointed for the children. Shortly thereafter, an attorney was appointed to represent the guardian *ad litem*. Slightly more than a year later, the original guardian *ad litem* withdrew from the case. The court then appointed the attorney who had been acting as the guardian's counsel to be the guardian *ad litem* to the children. This occurred five months before the start of the dispositional hearing. Although the record contains a statement by the guardian that she was also attorney for the children, the record reflects only her appointment as attorney for the guardian and, eventually, as guardian.

The original guardian was called as a witness at the dispositional hearing. She testified to witnessing some of appellant father's outbursts. She also reported on her interviews with the children shortly after they were removed from the home. According to this testimony, several of the children reported violence between their mother and father. They also told the guardian that their father drank beer and smoked marijuana. The children said that both parents disciplined them with spanking and occasional paddling. One of the five-year-old twins stated that dad took baths with her and told her not to tell.

In the end, the substitute guardian filed a report and recommendation with the court in which she stated that she believed the father had sexually abused the children. The guardian concluded that because of the father's behavior and the

mother's failure to protect the children from him, she believed that it was in the best interest of the children to grant permanent custody to appellee.

### Sexual Abuse

Although the original complaint in this matter was for neglect and dependency, it nevertheless contained an assertion that sexual abuse was suspected. As a result, all of the children were immediately evaluated by Dr. Gemill at the Medical College of Ohio and by an evaluator at the Unison Behavioral Health Group. Both reported no evidence of sexual abuse for any of the children.

In late June and early July 1996, some six months after their removal from the home, the children "disclosed" sexual abuse in the home. Six-year-old James reported that his father had tried to orchestrate sex between James and his sisters. His twin, who was also placed with James in the same foster home, reported the same thing. Five-year-old Rebecca said her dad had forced her to perform oral sex and that she and her twin sister were sexually active with each other in foster care.

The reasons for these disclosures were explored at the final hearing by defense witness, Dr. Melvin Guyer. Dr. Guyer is a member of the psychiatric faculty at the University of Michigan and a nationally known expert in child sexual abuse evaluation.

Dr. Guyer testified that it was his expert opinion that the only valid sexual abuse evaluations performed on these children were those conducted in January 1996 at MCO and Unison. He based his opinion on a review of the treatment notes and other documents relating to the disclosures. According to Dr. Guyer, the original caseworker for the family, Esther Fry, became convinced that there was sexual abuse in this family and refused to be swayed from this view by the January evaluations. Dr. Guyer testified that the therapy notes revealed that, even after the negative evaluation, Fry was telling foster parents and therapists that sexual abuse was suspected without also informing them of the prior negative evaluation results. Moreover, according to Dr. Guyer, it appears that at least one of the younger children came to believe that if she told "secrets about the family" she would be allowed to go home. The expectation among care givers to find some sexual abuse coupled with the children's desire to find the "right" answers—answers that would permit them to be reunited with their family—taint the later "disclosures" and make them totally unreliable in the opinion of Dr. Guyer.[2]

---

2. Dr. Guyer also noted that several national psychiatric and psychological organizations have promulgated protocols for evaluating children for sexual abuse. None of these protocols was followed with respect to the late disclosure of abuse in this case, according to Dr. Guyer.

At the conclusion of the dispositional hearing, the trial court found that despite appellee's offered services, the parents had not remedied the conditions which caused the children to be placed outside the home. The trial court further found that by their failure to follow the case plan, appellants had demonstrated a lack of commitment to the children and an unwillingness to provide a permanent home for them. On these findings, the court concluded that the children cannot now or should not, within a reasonable period of time, be placed with either of the parents. The court also found that it was in the children's best interest that permanent custody of the children be awarded to appellee and entered judgment accordingly.

From this judgment, appellants now bring this appeal setting forth the following five assignments of error:

"I. The trial court failed to appoint an attorney to represent the children, in violation of Ohio Juvenile Rule 4 and R.C. § 2151.281(H)

"II. The permanent custody proceeding deprived appellants of their Fifth Amendment rights, and failed to offer a good faith reunification plan

"III. The trial court erred by allowing hearsay of sexual abuse into evidence during the course of the trial, thereby denying appellants a fair trial

"IV. the limitations of contact between the parents and the children was improper and prejudicial

"V. The trial court's decision was against the manifest weight of the evidence."

■ The parent/child relationship possesses a unique sanctity in our culture and in our law. *In re Adam M.* (Aug. 20, 1999), Lucas App. No. L–97–1207, unreported, 1999 WL 628670; *In re Sara H.* (Dec. 16, 1994), Lucas App. No. L–94–116, unreported, 1994 WL 700629. A parent's right to raise his or her children has been characterized as an " * * * essential * * * basic civil right * * *." *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558. A parent's right to the custody of his or her child has been deemed "paramount." *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, 682–683, citing *In re Perales* (1977), 52 Ohio St.2d 89, 97, 6 O.O.3d 293, 297, 369 N.E.2d 1047, 1051–1052; see, also, *In re Hitchcock* (1996), 120 Ohio App.3d 88, 101, 696 N.E.2d 1090, 1097–1098. "A termination of parental rights is the family law equivalent of the death penalty in a criminal case. The parties to such an action must be afforded every procedural and substantive protection the law allows." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45, 55; *In re Hayes, supra.*

I

In their first assignment of error, appellants insist that the trial court erred to appellants' prejudice when it failed to appoint an attorney to represent the children in this case. The appointment of counsel for children is mandated by Juv.R. 4 and R.C. 2151.281(A), according to appellants.

Appellee responds that no attorney appointment for the children was necessary because this was not an "abuse case." The appointment of an attorney for the children is required by rule and by statute only when the complaint alleges that the child is an abused child, according to appellee. Here, appellee points to the complaint which only alleges that these children were neglected and dependent.

Alternatively, appellee argues that, even if an attorney was required for the children, after April 1997 the substitute guardian *ad litem* was an attorney who believed she was also appointed as counsel for the children and acted in that capacity. Both Juv.R. 4(C) and R.C. 2151.281 permit a licensed attorney who is appointed both guardian *ad litem* and attorney for his or her ward to perform these dual roles so long as there is no conflict of interest between the duties. At trial, the guardian specifically testified that there was no conflict between the desires of the children and the guardian's recommendations. Absent a conflict, appellee insists, the substitute guardian *ad litem*/attorney's representation of the children substantially complied with any requirement that the children be represented.

Appellants reply that although the initial complaint in this matter did not seek an adjudication of abuse, the allegations in the complaint clearly indicate that sexual and physical abuse was at issue. Moreover, appellants contend, the subsequent acts of appellee in ordering multiple invasive sexual abuse examinations for all six children leaves little doubt that the focus of the agency's investigation from the start was sexual abuse.

With respect to the dual role of the guardian *ad litem*, appellants insist that even were we to conclude that the guardian was constructively the children's attorney, it would require ostrich-like behavior for the guardian not to see the children's love for their parents and that their longing to be with their parents was in conflict with the guardian's recommendation that they be permanently separated from their family.

Juv.R. 4(A) provides:

"Every party shall have the right to be represented by counsel and every child, parent, custodian, or other person in loco parentis the right to appointed counsel if indigent. These rights shall arise when a person becomes a party to a juvenile court proceeding. When the complaint alleges that a child is an abused child, the court must appoint an attorney to represent the interests of the child. This rule

shall not be construed to provide for a right to appointed counsel in cases in which that right is not otherwise provided for by constitution or statute."

The rule sets forth the right of every party to counsel at " * * * all stages of the proceedings * * *. [A] 'party' to a juvenile court proceeding [is] defined by Juv.R. 2[X]." *In re Ferguson* (May 11, 1990), Lucas App. No. L–88–344, unreported, 1990 WL 61103, as cited in *State ex rel. Asberry v. Payne* (1998), 82 Ohio St.3d 44, 48, 693 N.E.2d 794, 798. Juv.R. 2(X) defines a "party" as, "a child who is the subject of a juvenile court proceeding[.]"

The right to counsel attaches as soon as a complaint is filed, Juv.R. 2(F)(1), or the child is taken into custody pursuant to Juv.R. 6. Juv.R. 2(F)(2). See, also, R.C. 2151.352; *State ex rel. Asberry v. Payne, supra.* Consequently, the six children who were the subject of this action had a right to counsel which attached in January 1996, when the children were removed from the home [3] and one should have been appointed for them at their first court appearance. The record reflects that no counsel for the children was ever appointed. Moreover, the children were not even arguably represented by counsel until April 1997, when counsel to the guardian replaced the original guardian *ad litem.*

We need next to consider whether it is possible that the appointment of a guardian *ad litem* and an attorney for the guardian *ad litem* is sufficient to satisfy the children's right to counsel. In this respect, Juv.R. 4(C) is instructive. The rule provides:

"(1) When the guardian ad litem is an attorney admitted to practice in this state, the guardian may also serve as counsel to the ward providing no conflict between the roles exist[s].

"(2) If a person is serving as guardian ad litem and as attorney for a ward and either that person or the court finds a conflict between the responsibilities of the role of attorney and that of guardian ad litem, the court shall appoint another person as guardian ad litem for the ward.

"(3) If a court appoints a person who is not an attorney admitted to practice in this state to be a guardian ad litem, the court may appoint an attorney admitted to practice in this state to serve as attorney for the guardian ad litem."

The rule specifically permits an attorney to act as both guardian *ad litem* and attorney to the ward, but recognizes the inherent danger of conflict in

---

**3.** Appellee's argument that the specific reference to the appointment of counsel for an alleged abused child in the rule restricts the right to only alleged abused children is unavailing. The rules and the case law clearly define who is to be afforded counsel and when the right attaches. Moreover, a plain reading of the complaint filed in this matter shows that both physical and sexual abuse were believed to be at issue. This is sufficient to "allege" abuse even were appellee's premise correct.

these roles. A lawyer for the child has an ethical duty to zealously represent his client within the bounds of the law. The attorney is the spokesperson for the ward's wishes. The role of the guardian *ad litem* is to investigate the ward's situation and then ask the court to do that which the guardian *ad litem* believes is in the ward's best interests. *In re Howard* (1997), 119 Ohio App.3d 201, 206, 695 N.E.2d 1, 3–4, citing *In re Baby Girl Baxter* (1985), 17 Ohio St.3d 229, 232, 17 OBR 469, 470–471, 479 N.E.2d 257, 259–260. It is held that for an attorney to act in both capacities, the court must first make a " * * * dual appointment, and a finding that no conflict exists." *In re Duncan/Walker Children* (1996), 109 Ohio App.3d 841, 845, 673 N.E.2d 217, 219.

Juv.R. 4(C) allows a court to appoint a guardian *ad litem* who is not an attorney. In such an instance, the court may appoint an attorney, "to serve as attorney for the guardian *ad litem.*" An attorney "for the guardian *ad litem*," as the term is used in section (C)(3), is not the same as "counsel to the ward" as the phrase is used in section (C)(1). It is a rule of construction that deviations in terminology ordinarily signal a difference in the meanings of terms. Dickerson, Legal Drafting (1981), 168–169. Moreover, the distinction is reasonable. Absent a conflict of interest, an attorney who is dually appointed as guardian *ad litem* /attorney for the ward can function as his or her own attorney and that of the ward. A lay guardian *ad litem* may require legal advice in properly executing the guardian's duty to investigate and recommend a disposition in a ward's best interest. At the same time, a ward may need an advocate for his or her position. Thus, the lay guardian *ad litem*, the attorney for the guardian, and the counsel to the ward each perform separate functions which must be dealt with separately by the court.

Juv.R. 4(A) provides that children who are the subject of a juvenile proceeding have a right to counsel. It is the court's duty to insure that this right is not violated. Since a lay guardian cannot act as counsel to a ward, the court must insure that the ward is represented by private counsel or, more likely since most minors would be considered indigent, appoint counsel for the ward.

In this case, the court appointed a lay guardian *ad litem* and an attorney for the guardian, but never an attorney for the children. Even were we to accept the substitute guardian's assertion that she performed as counsel to the children—a conclusion we expressly do not reach—this would be a dual appointment, requiring the court to consider whether there was a conflict between the roles of guardian *ad litem* and counsel for the children and make manifest its conclusion by finding that there was no such conflict. *In re Duncan/Walker Children, supra.* The record contains no such finding.

More importantly, perhaps, are the suggestions raised during the dispositional hearing that a conflict did exist. Even though the substitute guardian *ad litem*

reported that the children were in concurrence with the plan to permanently take them from their parents, there were repeated references in the hearing that the children loved their parents and wished to return to them. Indeed, Dr. Guyer testified that the notes kept by professionals treating the children suggest a desire to reunite the family which was so strong as to induce some of the children to fabricate "family secrets" in order to return home. At the least, these conflicting reports should have prompted the court to inquire further. Had it done so, through a separate hearing or an *in camera* interview with the children, it might have avoided the error that the uncertainty of the record suggests.

In sum, the children were entitled to counsel. None was ever appointed. They had not even arguable representation for a period of nearly fourteen months before the substitute guardian was appointed. If the substitute guardian's appointment was intended as a dual appointment, it was improperly executed. Even if the substitute guardian subjectively believed that she represented the children for the five months between her appointment and commencement of the dispositional hearing, enough indicators existed to question her assertion of a lack of conflict in her dual roles. All of this operated to the children's prejudice and concomitantly to the prejudice of the parents. See *In re Smith, supra,* at 13, 601 N.E.2d at 52–53. Accordingly, appellants' first assignment of error is well taken.

## II

In their second assignment of error, appellants argue that appellant father was denied his Fifth Amendment right against self-incrimination when, absent objective evidence, he was, " * * * targeted * * * as a sexual offender * * *."

We have held that a case plan which requires a parent to complete a course of treatment, admission to which requires him to admit that he is a sexual offender, is a violation of his right against self-incrimination protected by the Fifth Amendment to the Constitution of the United States and Section 10, Article I of the Ohio Constitution. *In re Amanda W.* (1997), 124 Ohio App.3d 136, 141, 705 N.E.2d 724, 727. Here, however, the record reflects that appellant father did not complete the anger management and sexual abuse groups to which he was assigned because he either refused to attend or behaved so inappropriately that he was rejected. Accordingly, appellants' second assignment of error is not well taken.

## III

In their third assignment of error, appellants contend that the final hearing was riddled with hearsay statements, arguing that appellee's heavy

reliance on these statements make the result unreliable. However, appellants only direct our attention to one specific instance of what they assert is inadmissible hearsay, testimony given by the original guardian *ad litem* that one of the children told her that appellant father took baths with her and touched her "koochie." This testimony was not objected to at trial and any error may, therefore, be deemed waived. *State v. Stearns* (1982), 7 Ohio App.3d 11, 15, 7 OBR 12, 16–17, 454 N.E.2d 139, 143–144; Evid.R. 103(A)(1). Accordingly, appellants' third assignment of error is not well taken.

## IV

In their fourth assignment of error, appellants assert that appellee's limitation of the parents' access to the children was improper. Appellants contend that the agency never had any reason to restrict the mother's access to the children and that the timing of the cessation of all visitation for appellant mother was suspicious, coming shortly after the sexual molestation of one of the children while in foster care.

The issue here is whether the trial court properly terminated appellants' parental rights. Appellants have failed to present authority or argument which makes parental visitation during the pendency of the case material to that issue. Accordingly, appellants' fourth assignment of error is not well taken.

## V

In their final assignment of error, appellants argue that the trial court's decision to terminate their parental rights was against the manifest weight of the evidence.

As discussed above, the right of the family to remain intact obtains constitutional protection. *Stanley v. Illinois, supra,* at 651, 92 S.Ct. at 1212–1213, 31 L.Ed.2d at 558–559. Therefore, on review, judicial decisions to terminate parental rights receive careful scrutiny and the permanent removal of a child from his or her family may be condoned, "Only where there is demonstrated an incapacity on the part of the parent to provide adequate parental care, not [because] better parental care * * * can be provided by foster parents or adoptive parents * * *." *In re Lay* (1987), 43 Ohio App.3d 78, 82, 539 N.E.2d 664, 669; see, also, *In re William S.* (1996), 75 Ohio St.3d 95, 97, 661 N.E.2d 738, 740; R.C. 2151.01(C).

Before any court may consider whether a child's best interests may be served by permanent removal from his or her family, there must be first a demonstration that the parents are "unfit." *Quilloin v. Walcott* (1978), 434 U.S.

246, 255, 98 S.Ct. 549, 554–555, 54 L.Ed.2d 511, 519–520; see, also, *In re Schoeppner* (1976), 46 Ohio St.2d 21, 24, 75 O.O.2d 12, 13–14, 345 N.E.2d 608, 610.

When a child is not abandoned or orphaned, the Ohio equivalent of parental unfitness is a statutory determination that he or she, "cannot be placed with either of his parents within a reasonable period of time or should not be placed with his parents." R.C. 2151.414(E)(1); *In re Sara H.* (Dec. 16, 1994), Lucas App. No. L–94–116, unreported, 1994 WL 700629. R.C. 2151.414(E) directs that this threshold conclusion may only be entered if, following a hearing, the court concludes that there is clear and convincing evidence that one of the twelve predicate conditions enumerated in R.C. 2151.414(E)(1) through (12)[4] exists. See *In re William S.*, *supra*, syllabus. Once this finding is properly entered, the court must then determine whether terminating a parent's parental rights is in the child's best interests. R.C. 2151.414(D).

In this case, the court relied on two R.C. 2151.414(E) factors to support its conclusion that these six children cannot or should not be placed with their parents.

## A

The court found that R.C. 2151.414(E)(1) and (E)(4) had been proven. R.C. 2151.414(E)(4) states that a court may make a predicate finding if "[t]he parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child."

In this case, the court specifically references finding a lack of commitment because the parents demonstrated an, "unwillingness to provide an adequate permanent home for the children."

We find no support for this finding. The testimony was that the parents were purchasing the home in which the family lived and that the house desperately needed repairs. These were under way when the children were taken from the home and appellee refused to allow the children to return to the home until certain repairs were made. It is unrefuted that the house was brought into sufficient compliance to return the children there. No evidence was presented that the home had deteriorated after it was deemed acceptable by appellee.

---

4. Effective March 18, 1999, R.C. 2151.414(E) was amended to add an additional four conditions. 1998 Am.Sub.H.B. 484. This amendment was not effective for this case.

B

R.C. 2151.414(E)(1) provides that a predicate finding may be entered if "[f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."

Our analysis of this finding requires that we (1) determine the specific reason why the child was placed outside the home, then (2) examine the efforts of the public children services agency to remedy the problem that caused removal, and (3) survey the record to determine whether there was clear and convincing evidence presented demonstrating that the parents failed continuously and repeatedly to substantially remedy the conditions causing removal. *In re McCormick* (Aug. 28, 1992), Erie App. No. E–91–79, unreported, 1992 WL 206953.

The complaint associated with a child's removal from the home is an appropriate indicator of the reasons for the child's removal. *In re William S., supra,* 75 Ohio St.3d at 100, 661 N.E.2d at 742; *In re McCormick, supra, In re Sara H., supra.*

In this matter, the complaint contains four categories of allegations:

(1) The parents' medical neglect for failing to keep a follow-up appointment after Rachel's surgery;

(2) Suspected physical abuse

(a) Rachel's elbow injury was the second in a year,

(b) on another occasion Rachel was treated for bleeding " * * * alleged[ly] * * * when she fell,"

(c) Rebecca reports mother paddles her and her father slaps her;

(3) Suspected sexual abuse

(a) a nurse's examination of one of the children revealed a genital abnormality "which could be consistent with sexual abuse,"

(b) the six-year-old boy responded he "did not know" when asked if anyone ever touched him on his bottom or his penis;

(4) Appellant father is loud, obscene, defiant, bombastic and uncooperative and appellant mother does not stop him

(a) appellant father "drinks beer every day,"

(b) appellants fight, police have been called,

(c) appellant father is an ex-con who speaks "proudly" of how well police know him,

(d) appellant father "has a history of cocaine abuse" and has been diagnosed as having "an antisocial personality disorder,"

(e) appellant father usually acts "inappropriate to circumstances,"

(f) appellant father placed a threatening call to the physician he believed reported Rachel's missed appointment,

(g) appellant father is "openly hostile" to appellee's caseworker,

(h) appellant mother will not stop appellant father's boorish behavior or leave him.

Shortly after they were removed from the home, all six children were screened by psychological and medical experts who reported that no sexual or physical abuse could be confirmed.[5] Six months later, some of the younger children made statements to therapists or foster parents which appellee characterized as "disclosure" of sexual abuse at the hands of appellants. However, at trial, appellants' expert, Dr. Guyer, testified at length that his examination of the therapists' notes and other materials showed that the interview technique used to elicit these "disclosures" violated the protocols of every organization which issues such guidelines. In fact, according to Dr. Guyer, it appeared that one of the children came to believe that she would be reunited with her parents if she told "secrets" about the family. It was Dr. Guyer's expert opinion that the only reliable inquiries into sexual abuse were those conducted by Dr. Gemill at the Medical College of Ohio and by Unison Behavioral in January 1996. These reports indicated there was no sexual abuse.

At the conclusion of the trial, the court adopted findings of fact drafted by appellee. The only finding related to sexual abuse was the following:

"18. Witness [therapist] Croniser stated that James, (the child), * * * described sexual acts that he [sic] father forced him to have with his sisters. * * *"

---

**5.** When it appeared that the agency would permit the maternal grandmother to care for the children in the family home, appellants consented to a neglect/dependency finding. Later, as the relationship between the agency and the grandmother began to deteriorate, appellants sought to set aside the consent finding. The trial court denied a motion to that end and issued a finding of fact paralleling the language of the complaint.

■ In order to sustain the trial court's conclusion pursuant to R.C. 2151.414(E)(1) that within a reasonable period of time the children cannot and should not be placed with their parents, the record must contain clear and convincing evidence that appellants, with the diligent assistance of appellee, failed to substantially remedy the conditions which caused their removal from the home. Clear and convincing evidence is the highest level of evidentiary support necessary in a civil matter and has been defined as more than a mere preponderance of the evidence, but evidence sufficient to establish in the mind of the trier of fact a "firm belief or conviction as to the facts sought to be established." *In re McCormick, supra,* quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

Of the reasons stated in the initial complaint for removing the children from the home, the complaint itself states that the missed physician's appointment was made up by the time the complaint was filed. Although there was some evidence that there was domestic violence of some nature between appellants and that the children were occasionally disciplined by spanking and paddling, there was no evidence presented that this rose to the level of physical abuse of the children. With respect to sexual abuse, the court could have rejected the expert's testimony about the unreliability of the later "disclosure," but it does not appear to have done so. The only fact found relating to this allegation is that a witness said that one of the children said something which, if true, might constitute sexual abuse. The court made no finding that this statement was true.

■ What remains is the assertion that appellant father is an uncooperative ex-con with an attitude. He is one who behaves inappropriately and is openly hostile to appellee's caseworkers. And, appellant mother does not stop him from being all these things.

Two statements from the final dispositional hearing strike us. The first was the opening statement of appellants' counsel who rhetorically asked how it came to be that a missed doctor's appointment escalated into a proceeding to permanently sever the ties between six children and their parents. The second was testimony from the caseworker who made the decision to seek permanent custody. She said that if the parents had only followed the case plan, they would have been on the path to reunification with the children.

We note that the failure to follow a case plan is not one of the unfitness equivalents enumerated in R.C. 2151.414(E). Neither is being unpleasant to social workers. However, appellant father's bizarre behavior is well-documented and it is undoubtedly one of, if not the, principal reason the children were removed from the home. There was ample evidence at the dispositional hearing that this behavior continues and this evidence, along with appellant father's refusal to avail himself of the services offered by appellee, in our view, could be

found to establish by clear and convincing evidence that appellant father failed to remedy a condition which caused the children to be removed from the home.

With respect to appellant mother, she was and is unable to restrain appellant father's behavior. Therefore, the trial court could have found that she, too, had failed to remedy a problem that caused removal of the children.

Accordingly, appellants' assignment of error as it relates to R.C. 2151.414(E)(4) is found well taken:; as it relates to R.C. 2151.414(E)(1), it is not well taken. As R.C. 2151.414 requires only one of the requisite findings, our conclusion with respect to R.C. 2151.414(E)(4) has no effect on the ultimate outcome of this case.

On consideration, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is reversed. This matter is remanded to said court to appoint an attorney to represent the children's interests and conduct further proceedings in conformity with this decision. Costs to appellee.

*Judgment reversed.*

KNEPPER, J., concurs.

MELVIN L. RESNICK, J., dissents.

MELVIN L. RESNICK, Judge, dissenting.

I must respectfully dissent as to the disposition of the first assignment of error in this case. Juv.R. 4(A) expressly states that "[w]hen the complaint alleges that a child is an abused child, the court must appoint an attorney to represent the interests of the child." Here, the statement in the complaint involving a finding of a genital abnormality in one of the children that *may* be consistent with sexual abuse does not rise to an allegation that any of the six children involved is an abused child within the meaning of the rule or statutory law, see R.C. 2151.031. Instead, the complaint alleges that these children are neglected and dependent. The parents stipulated to a finding of the same. There is no finding of abuse, sexual or physical, anywhere in the record. Accordingly, pursuant to Juv.R. 4(A), the children were not entitled to appointment of counsel. I would find appellants' first assignment of error not well taken and affirm the judgment of the trial court.