OPINION
Defendant-Appellants, Monica Clark and Jonathan Fry (collectively, "Appellants"), bring this appeal from a Marion County Common Please Court, Juvenile Division, decision terminating their parental rights and granting permanent care and custody of their children to Plaintiff-Appellee, Marion County Children Services Board ("MCCSB"). Considering the evidence of Clark's completion of a substantial portion of the case plan requirements, her positive relationship with her children, and discrepancies within the trial court's findings, we find insufficient evidence to support a finding by clear and convincing evidence that one or more statutory factors exists supporting the conclusion that termination of parental rights would be in the children's best interests.
Facts and procedural history relevant to issues raised on appeal are as follows: On November 5, 1996, the MCCSB filed a complaint alleging that Clark's children were neglected and dependent due to her cocaine addiction, positive cocaine test results in violation of her probation, and history of providing inadequate supervision of the children while abusing cocaine. In March 1997, custody of the children was placed with Clark's mother, Kim Delaney, with the MCCSB exercising protective custody. The children were returned to their mother's custody in October 1997. The MCCSB requested termination of protective supervision in December 1997, because Clark was residing at a rehabilitation center where they could work with her and provide supervised care for the children while she received treatment.
In October 1998, the MCCSB filed a second complaint alleging that Clark had resumed her drug use, had no income, had her utilities shut off, had missed medical appointments for her children, and had left her children unsupervised. Based upon a stipulation by all parties, the children were subsequently found to be neglected and dependent, custody of the children remained with Clark under the MCCSB's protective supervision, and Clark was directed to comply with the case plan, family preservation, and counseling.
In May 1999, the MCCSB sought and obtained an emergency order to remove the children from Clark's care. The MCCSB based the order upon Clark's violation of a previously issued no-contact order by continuing her relationship with Danita Snow, a woman determined to be a danger to the children. In July 1999, the court ordered the parents to comply with the case plan and drug test requests and directed that the children have no contact with Snow. Thereafter, in September 1999, the court found the children to be dependent and placed them with the MCCSB. Clark was ordered to continue Alcoholics Anonymous ("AA") meetings and therapeutic counseling. In addition, the MCCSB was to arrange extended visits for Clark, investigate Fry's home, and, if appropriate, extend visits to him.
Believing that the parties had made little progress towards satisfying the case plan, the MCCSB requested that the court review the plan and order its completion. On January 20, 2000, the court directed the MCCSB to submit an amended case plan and ordered that Fry have a drug and alcohol assessment and psychological evaluation. In April 2000, the court approved the amended case plan and ordered the parties to comply therewith.
On October 2, 2000, the MCCSB moved for permanent custody of the minor children, alleging that Clark had "failed to substantially remedy conditions which led to the children's removal and continued placement with the [MCCSB]." The matter was heard in July, August, and September 2001. On September 20, 2001, the guardian ad litem submitted a report recommending that the permanent custody motion be denied and that the children be gradually returned to their mother under certain conditions.
On February 20, 2002, the trial court granted permanent custody to the MCCSB. The instant appeal followed, with Appellants asserting the following common assignment of error: "The Marion County Children Services Board failed to establish, by clear and convincing evidence that an award of permanent custody was warranted herein. The lower court abused its discretion in granting the Agency permanent custody when the parent(s) had made substantial efforts to remedy the conditions that caused the removal of the minor children, and the children could have been returned to the parents." Because Fry seeks only to maintain visitation rights, we limit our inquiry to Clark's ability to provide adequate parental care, and whether legally secure placement could not occur without a grant of permanent custody to the agency.
A parent's right to raise his or her child is an "essential" and "basic civil right."[1] Parents have a "fundamental liberty interest" in the care, custody, and management of their children.[2] A grant of permanent custody divests natural or adoptive parents of any and all parental rights, privileges and obligations, including all residual rights and obligations.[3] Therefore, parents facing permanent termination of parental rights must be afforded every procedural and substantive protection the law allows.[4] Statutory provisions governing child custody matters are to be liberally construed to provide for care, protection, and mental and physical development of children, in a family environment when possible, separating child from parents only when necessary for the child's welfare or in the interests of public safety.[5] Moreover, judicial decisions terminating parental rights receive careful scrutiny, and the permanent removal of a child may be condoned only where there is demonstrated an incapacity on the part of the parent to provide adequate parental care, not because better parental care can be provided by foster or adoptive parents.[6] The rights and interests of a natural parent are not, however, absolute: where a court finds that permanent custody is appropriate under circumstances of a particular case and all due process safeguards have been followed, whatever residual rights a parent may have are properly divested.[7]
Because a parent's constitutionally protected liberty interest is at stake in a permanent custody proceeding, due process requires the State to prove that applicable statutory factors have been met by clear and convincing evidence.[8] Clear and convincing evidence is defined as that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to facts sought to be established.[9] Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of fact complied with statutory requirements and whether there was sufficient evidence to support its finding by clear and convincing evidence that one or more statutory factors precluding that child's return to either parent exist.[10]
R.C. 2151.413, which permits a public children services agency to file a motion requesting permanent custody of a child, provides that agencies granted temporary custody of a child who is not abandoned or orphaned may file a permanent custody motion in the court that made the disposition of the child. Where, as here, a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, R.C. 2151.414(B)(1) permits a court to grant permanent custody upon a finding that it would be in the child's best interests.[11] The focus of the "best interest" determination is upon the child, not the parent,[12] as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents.
In determining the best interests of a child, R.C. 2151.414(D) provides that "the court shall consider all relevant factors, including, but not limited to, the following:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
In the instant case, there is no issue as to whether the trial court complied with statutory guidelines; therefore, the focus of our inquiry is whether the record contains sufficient, clear and convincing evidence in support of its findings and decision to award permanent custody to the MCCSB.
In support of its determination, the trial court found, generally, that "[t]he evidence is clear and convincing that permanent care and custody would be in the children's best interest because they have been in the custody of Marion County Children Services for more than twelve of the last twenty-two months as set forth in the O.R.C. Section2151.414(D)(1),(3),(4), and (5). The children are in need of a legally secure environment and such a placement cannot be achieved without an award of permanent care and custody, and there exists several factors listed in O.R.C. Section 2151.414(E) that exist regarding the children and their parents." More specifically, the court indicated that "the parents have shown a lack of commitment to the child[ren] by failing to visit and provide support for the children."
We find no support for this finding with respect to Clark. By all accounts, she religiously attended her scheduled visits and shared a mutual bond with the children, who looked forward to her visits and loved her. Although testimony indicated that the children suffered from "night terrors," displayed inappropriate sexual behaviors, and the eldest child exhibited anger management problems while in foster care, there was no evidence that the children displayed these behaviors while in their mother's care or had been sexually abused. Conversely, Anna Tinnarello, the caseworker at the time the children were removed, testified that there were no behavioral issues at the time of removal. Sophia Sparks, an outpatient therapist at the Marion Area Counseling Center, testified that she could not determine the source of the children's behavior and that such behavior could be a product of separation from their parents. Moreover, testimony from other caseworkers and the foster mother indicated that this behavior subsided with consistent parental visits.
As mentioned previously, the MCCBS moved for permanent custody alleging that Clark had "failed to substantially remedy conditions which led to the children's removal and continued placement with [MCCSB]." R.C.2151.414(D) (2) and (E)(1) examine whether, following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home and whether legally secure placement can be achieved without a grant of permanent custody to the agency. In this respect, the trial court found that "the mother is outwardly compliant but is unable to manage all the steps set forth in the case plan."
Our review of this determination requires that we examine the specific reasons why the child was placed outside the home, review efforts of the public children services agency to remedy the problem that caused removal, and then survey the record to determine whether there was clear and convincing evidence presented demonstrating that the parents continuously and repeatedly failed to substantially remedy the conditions precipitating removal, and that legally secure placement could not be achieved without awarding the agency permanent custody.[13] The complaint associated with a child's removal from the home, case plan, and motion for permanent custody are appropriate indicators of the reasons for the child's removal.[14]
Notably, the MCCSB indicated that the basis for the May 1999 removal was Clark's affiliation with Snow. The case plan applicable at the time of the permanent custody motion cited as underlying concerns: (1) Clark's history of drug abuse; (2) the fact that she had permitted her children to have contact with Snow in violation of the court's no-contact order, and; (3) her inability to maintain a permanent residence. MCCSB's permanent custody motion contains several allegations echoing these concerns, including: (1) Clark has chronic and severe problems with drugs and alcohol; (2) she has attended residential treatment centers but continues to use illicit drugs; (3) she is involved in an intimate relationship with a person who is an alleged perpetrator of sexual abuse toward several minors; (4) she refuses to understand the need to protect her children from this party; (5) she has failed to abide by a no contact order regarding Snow, and; (6) she has not complied with the court-ordered case plan and has not made any consistent or lengthy progress to regain custody of her children. Accordingly, we examine the changes and actions expected by the case plan in light of Clark's efforts towards satisfying those directives.
 Drug Abuse
As mentioned above, the permanent custody motion references daily cocaine use and asserts that Clark has "chronic and severe problems with drugs and alcohol" and "continues to use illicit drugs." However, Melissa Kline, the caseworker between February 2000 and March 2001, and party who filed the motion, admitted that she had no personal knowledge or evidence substantiating these allegations. Kelli Deaton, the current caseworker, also admitted that, despite her belief that she had a duty to amend a permanent custody motion if in error, the motion contained erroneous representations and significant allegations without substantiating evidence. Deaton further admitted that she signed the current case plan relying upon the representations of previous counselors and that the plan may have been outdated.
Nevertheless, to address perceived drug abuse issues, Clark was required to do as follows: (1) continue to receive therapeutic counseling at Marion Area Counseling Center ("MACC") and to abide by the counselor's recommendations; (2) sign a release of information from MACC; (3) cooperate with random drug and alcohol testing; (4) give the caseworker receipts from AA; (5) refrain from drinking alcohol in the children's presence, and; (6) cooperate with a drug and alcohol assessment and with any recommendations made by the counselor with regards to the assessment. In support of its determination, the court found that Clark had a history of drug and alcohol problems, that she had "been at Freedom Hall in Crestline, Beacon Hall in Wooster, and did not complete the program at Anne Thyst House [sic] where she completed two and a half phases but did not disclose the number of phases in the program[,]" that most of the drug tests she took were delayed from the date requested, and that testimony indicated that she was "treatment wise."
The record, however, reveals that Clark has cooperated with a drug and alcohol assessment and signed a release of information from MACC. By all indications, what history or evidence of drug use the MCCSB has is more than two years old. The caseworkers who testified had no evidence or knowledge of drug or alcohol use after 1998. Moreover, of the eight tests taken in the previous two years, six were conducted upon the day requested and two were taken within two or three days of the request. All tests but one yielded negative results and MCCSB accepted an excuse from her doctor for the single positive result. Kline testified that Clark never refused her requests and provided an explanation for the delayed tests, indicating that she would often give Clark a period of time after the date she submitted her request to have the test administered. In addition, Deaton testified that the temporary delay between the request and date the tests were taken would not provide sufficient time to clean any drugs out of her system. Although Clark failed to continuously attend AA or complete other counseling, she had provided AA slips to at least one caseworker, had participated in several counseling programs, and was currently enrolled in counseling at the time of the dispositional hearing.
 Contact with Danita Snow
Regarding the concern with Clark's contact with Snow, the case plan required that Clark realize that Snow presented a safety risk to her children and not permit any contact with Snow pursuant to the no-contact order. The court found that Clark continued her relationship with Snow for an extended period of time in violation of the court order. While Clark had continued contact with Snow for a period of time in violation of the order, the uncontroverted testimony was that she had not had any type of mail, phone, or other correspondence with Snow in more than twelve months.
 Stable Residence
To address safety issues related to the lack of a permanent and stable family residence, Clark was required to: (1) acquire and remain at a permanent residence safe for her children; (2) provide each child with an individual bed; (3) permit monthly visits to the residence, and; (4) have the residence approved by the MCCSB.
At the time of the dispositional hearing, Clark had been employed by the same company for more than twelve months and had been the named lessee at the same residence for more than fourteen months. Each child had his own bed within the residence. Caseworkers who visited the apartment indicated that she was polite, cordial, and made no attempts to prevent or interfere with their visits. Moreover, Kline and Deaton agreed that despite its small size, the apartment was clean, safe, and had sufficient room for Clark and her children. In fact, Kline, who testified that she was "heavily involved" in the case and that her main concern was the children's safety and well-being, testified that based on the facts known to her in January or February of 2001, there was no danger posed to return of the children to their mother.
Additionally, at the time of the dispositional hearing, Deaton remained concerned with the presence of Clark's current paramour, Ray Ramio, and his six-year-old child. She felt that the two-bedroom apartment would be overcrowded with Ramio and his child residing therein and was concerned with his past involvement with MCCSB: Ramio had plead guilty to three counts of child endangering in 1992, and was ordered to undergo a psychological evaluation and counseling. The guardian ad litem, believing that significant progress had been made toward the case plan, recommended that the boys be gradually returned to their mother, subject to several conditions, one of which was that no contact be permitted with Snow or Ramio. The court dismissed this recommendation, finding that "[m]other will not accept this so the guardian's recommendations cannot be considered." However, a review of the record reveals no evidence indicating that Clark was unwilling to abide by this condition; conversely, she testified that she would be willing to request Ramio to move out if necessary to secure the return of her children, whom she indicated were of primary importance.
Moreover, several statements from the final dispositional hearing strike us. First, several caseworkers testified that if Clark had stable employment, a stable home, stayed away from Snow, and was drug and alcohol free, this would be significant progress. As discussed above, Clark appears to have satisfied these conditions and has made considerable progress towards other elements of the case plan. Kline's testimony that there was no reason the children could not be returned to their mother in January or February of 2001 and the guardian ad litem's recommendation that the children could be returned to their mother appear to substantiate her progress and ability to provide independent care for her children in the near future. Most troubling, however, are Kline's admission that she incorporated several erroneous representations and significant allegations into the permanent custody motion without substantiating evidence, Deaton's failure to correct the allegations despite her belief that she had a duty to amend the unsubstantiated motion, and the fact that Deaton merely copied the apparently outdated case plan without considered review.
Considering the evidence of Clark's completion of a substantial portion of the case plan requirements, her positive relationship with her children, and discrepancies within the trial court's findings, we find that the record does not provide clear and convincing support for the trial court's determination that permanent placement would be in the children's best interests. Although we recognize the importance of permanent placement for the children, we are not willing to condone the permanent removal of a child from his or her family without an adequate demonstration of a parent's incapacity to provide adequate parental care. Therefore, while we recognize that the standard for reviewing a trial court's grant of permanent custody is abuse of discretion, and that an abuse of discretion is more than a mere error in judgment, we are compelled by the record herein to find that the trial court's conclusion that a termination of parental rights would be in the children's best interests was not supported by the record and is therefore arbitrary and constitutes an abuse of discretion. Accordingly, Appellants' assignment of error is well taken.
Having found error prejudicial to the appellants herein, in the particulars assigned and argued, the judgment of Marion County Court of Common Pleas, Juvenile Division, is hereby reversed and remanded for further proceedings in accordance with this opinion.
Judgment reversed.
HADLEY and BRYANT, JJ., concur.
[1] In re Murray (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169;Stanley v. Illinois (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-1213,31 L.Ed.2d 551, 558-559.
[2] In re Murray, supra, citing Santosky v. Kramer (1982), 455 U.S. 745,753, 102 S.Ct. 1388, 1394-1395, 71 L.Ed.2d 599, 606.
[3] In re Palmer (1984), 12 Ohio St.3d 194, 196, 465 N.E.2d 1312, certiorari denied 105 S.Ct. 918, 469 U.S. 1162, 83 L.Ed.2d 930.
[4] In re Hayes (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, reconsideration denied 79 Ohio St.3d 1492, 683 N.E.2d 793.
[5] In re William S. (1996), 75 Ohio St.3d 95, 97, 661 N.E.2d 738,740; In re Wise (1994), 96 Ohio App.3d 619, 645 N.E.2d 812.
[6] In re Stacy S. (1999), 136 Ohio App.3d 503, 516, 737 N.E.2d 92; Inre Lay (1987), 43 Ohio App.3d 78, 82, 539 N.E.2d 664, 669; In re WilliamS., 75 Ohio St.3d at 97.
[7] In re Palmer, 12 Ohio St.3d at 196.
[8] In re Rodgers (2000), 138 Ohio App.3d 510, 519, 741 N.E.2d 901; R.C. 2151.414.
[9] State v. Schiebel (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54,60.
[10] In re Nicholas H. (2000), 137 Ohio App.3d 442, 448,738 N.E.2d 896.
[11] In re Evans (Oct. 30, 2001), Allen App. No. 1-01-75.
[12] In re Wise, 96 Ohio App.3d at 624; In re Awkal (1994),95 Ohio App.3d 309, 315, 642 N.E.2d 424.
[13] In re Stacy S., 136 Ohio App.3d at 518.
[14] Id.; In re William S., 75 Ohio St.3d at 100.