This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, Frank Hiltabidel, appeals from the judgment of the Summit County Court of Common Pleas, Juvenile Division, terminating his parental rights and granting permanent custody of his child to the Summit County Children Services Board ("CSB"). We affirm.
 I.
Mr. Hiltabidel's daughter, Shannon, born March 18, 2001, constitutes the subject of this appeal. The mother of the child, Stephanie Hiltabidel, participated in the proceedings before the trial court but is not a party to the present appeal.
On March 22, 2001, CSB filed a sworn complaint, alleging that Shannon was a dependent child. The complaint was filed after the child was born due to CSB's concerns that the parents were unable to provide adequate parental care. The juvenile court granted CSB emergency temporary custody.
On April 30, 2001, Shannon was adjudicated to be a dependent child. The dispositional hearing followed, and, on May 30, 2001, the court ordered the child be committed to the temporary custody of CSB. On September 19, 2001, CSB filed a motion for permanent custody of the child. Following a hearing on the motion, the juvenile court terminated the parental rights of Mr. and Ms. Hiltabidel and granted permanent custody of Shannon to CSB. This appeal followed.
 II.
Mr. Hiltabidel asserts three assignments of error. We will discuss them each in turn.
 A. First Assignment of Error "THE TRIAL COURT'S FINDINGS OF FACT AND DECISION TO GRANT PERMANENT CUSTODY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
In his first assignment of error, Mr. Hiltabidel asserts that the trial court acted against the manifest weight of the evidence in granting CSB permanent custody of his daughter. We disagree.
When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), 9th Dist. No. 18983. In determining whether a criminal conviction is against the manifest weight of the evidence:
 "`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175; see, also, State v. Otten (1986), 33 Ohio App.3d 339, 340.
 "Every reasonable presumption must be made in favor of the judgment and the findings of facts [of the juvenile court]." Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id. Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence in this context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
The termination of parental rights is governed by R.C. 2151.414. As relevant to this case, before a juvenile court may terminate parental rights with regard to a child who is neither abandoned nor orphaned, it must apply a two-prong test and find by clear and convincing evidence that: (1) it is in the best interest of the child to be placed in the permanent custody of the petitioning agency, based on an analysis under R.C. 2151.414(D), and (2) that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E). See R.C. 2151.414(B); see, also, In re William S. (1996), 75 Ohio St.3d 95, 99. Clear and convincing evidence is that which will produce in the trier of fact `"a firm belief or conviction as to the facts sought to be established.'" Inre Holcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus.
In determining what is in the best interests of the child under R.C.2151.414(D), the court should consider all relevant factors, including, but not limited to, the following statutory factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care-givers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]"
In considering whether the children can or should be placed with a parent within a reasonable time, the court is to consider all relevant evidence. R.C. 2151.414(E). R.C. 2151.414(E) also contains separate factors, the presence of any one of which requires the court, upon a finding by clear and convincing evidence that the factor is present or occurred in the case, to enter a finding that the child cannot or should not be placed with a parent within a reasonable time.
Evidence was presented at the hearing on the motion for permanent custody through several witnesses. Dr. KC Hiremath, a staff psychiatrist at Community Support Services ("CSS"), testified that, while both Mr. and Ms. Hiltabidel had previously been involved in counseling with CSS, he began treating them as patients in May of 2000 and April of 1999 respectively. Dr. Hiremath stated that Mr. Hiltabidel was diagnosed with bipolar disorder, attention deficit hyperactivity disorder, antisocial personality disorder, history of seizure, asthma, and borderline intellectual functioning. He also stated that Mr. Hiltabidel has behavioral problems that relate to being argumentative and demanding, although, in the past year, he has acted in a slightly more mellow manner. Dr. Hiremath testified that Mr. Hiltabidal has had problems with missing his scheduled appointments, failing to appear at two appointments which prevented a psychiatric evaluation, and not following through with a neurological consultation as recommended. Additionally, he does not take his medicine as prescribed. Specifically, Mr. Hiltabidal is currently prescribed Depakote, a medicine for mood stabilization, but his lab results demonstrated that the levels of medication in his system were below where they would be if he was taking his medicine properly.
Referring to the fact that Mr. Hiltabidel acted argumentatively, Dr. Hiremath noted that Mr. Hiltabidel always believes that he is right and blames others for his problems. He mentioned that Mr. Hiltabidel has become better at listening throughout the last year but that, even when he tries to be cooperative, he still becomes argumentative. Mr. Hiltabidel also has problems with mood swings. Dr. Hiremath testified that Mr. Hiltabidel's disorders are not curable; specifically, he can become stable but is prone to relapse.
Upon reviewing the CSS records, several issues raised concerns with regard to Mr. Hiltabidel's mental health. The results of the Psychological Screening Symptom Checklist-90-R for the years of 1999, 2000, and 2001 indicate that he is consistently in the very high range for eight of the nine categories and in the high range for remaining category of hostility. Mr. Hiltabidel's scores indicated a very high range of symptomatology with regard to psychoticism, paranoid thinking, phobic anxiety, anxiety, depression, interpersonal sensitivity, obsession/compulsion, and somatization. Further, the weekly progress notes documented problems involving, among other things, mood swings, acting in an argumentative manner, and personal hygiene.
Dr. Hiremath testified with regard to Ms. Hiltabidel and stated that she has issues with depression, borderline personality disorders, history of posttraumatic stress disorder, and character disorder. Relating to this diagnosis, Ms. Hiltabidel experiences unstable moods, mood swings, depressive moods, and psychotic symptoms. She also can be somewhat paranoid around people. Regarding the psychotic symptoms, Dr. Hiremath stated that she has improved by maintaining her appointments and taking her medication. He also stated that the last time she was admitted to the hospital was April 27, 2000 due to suicidal ideation. Dr. Hiremath testified that her problems are not curable but that, with medication, she has been able to take classes and find employment. Ms. Hiltabidel still experiences mild depression every once in a while, and the medication is necessary to prevent future serious relapses. When asked, Dr. Hiremath testified that he cannot predict what the future will hold for either parent because their problems are chronic and they do not have the same ability as other people to cope with stress or other factors in their daily lives.
Tracy Wiesen, who works at CSS and provides case management to people who suffer from mental illness, testified that she began to work with Ms. Hiltabidel when she was pregnant and continued working with her for approximately one full year. One of the issues she addressed with Ms. Hiltabidel was housing because the couple's first home was both filthy and unsafe. Later, the couple moved into subsidized housing through the Akron Metropolitan Housing Authority ("AMHA"). Their second home was significantly better but, over time, became dirty and cluttered. Specifically, the floors were neither mopped nor swept and were covered with food crumbs, the ashtrays were overflowing, items were dusty, trash was not thrown away, and the dishes were not cleaned. Additionally, as the windows were always shut with either the blinds or drapes pulled closed, the house remained very dark.
Ms. Weisen testified that she repeatedly explained to the Hiltabidels not only the health concerns that would be raised by a child living in an unclean home but, also, that smoking in the home is not good for a child. Ms. Wiesen also testified that both parents are capable of performing housekeeping duties but that, according to Ms. Hiltabidel, she is the person who does everything in the house with no assistance from her husband. Ms. Wiesen stated that, the last time she went to the house, the condition of the home had not improved; rather, the home remained unclean, dark, and dreary. With regard to the Hiltabidels' interaction with Shannon, Ms. Wiesen noted that the couple had tried to prepare for the birth of their child by getting things that a baby would need but that, later, when she was around the child, Ms. Hiltabidel seemed nervous and uncomfortable.
Victoria Diamond, a social services aide at Summit County Children Services, testified that she supervises visitations between parents and their children. She distinguished between supervised visits, where a supervisor must remain in the room during the entire visit, and monitored visits, where a supervisor can walk in and out of the room during the visit because close attention is not necessary for the child's safety. She testified that, with regard to the Hiltabidels, there was never a time when she could lessen the constant supervision she gave the parents.
Ms. Diamond stated that, although it was her role to assist the Hiltabidels as they learned how to properly interact with their daughter, Mr. Hiltabidel always insisted that he already knew how to do everything. In fact, not only was Mr. Hiltabidel unreceptive to her suggestions, but, sometimes, would become agitated during a visitation and would stomp, pace, or accuse the aide of antagonizing him. Although Mr. Hiltabidel was able to feed and change the baby, he often seemed more concerned with showing off rather than making sure his daughter received proper care. Moreover, Mr. Hiltabidel would belittle Ms. Hiltabidel because she could not do the things that he could do. Ms. Diamond also expressed concern over an incident where Mr. Hiltabidel told her that he did not have a dollar to buy his daughter a toy from the visitation center's dollar-toy tree but that he would discuss using Ms. Hiltabidel's money to buy himself videos or video games.
Ms. Diamond testified that, throughout the visitations, Ms. Hiltabidel never learned how to properly hold, diaper, or dress her daughter. Even after several months, Ms. Hiltabidel would spend an extended period of time trying to change the baby, only to put the diaper on backwards. Additionally, it took her three months to learn how to feed the baby with a bottle. Further, Ms. Hiltabidel never remembered that a child could fall off a changing table if left unattended. Ms. Diamond stated that Ms. Hiltabidel never asked to hold her child and would only keep the child for five minutes before asking Mr. Hiltabidel to take her. Moreover, Ms. Hiltabidel rarely talked to the baby or held the baby so that there was eye contact between herself and her daughter.
Ms. Diamond testified that she did not feel that the Hiltabidels ever bonded with their daughter. Specifically, she never saw either parent ever kiss the child or initiate any diaper changing or preparation of the bottles to feed the baby. Additionally, whenever the child cried, the parents would resort to feeding the child, despite alternative methods offered by the aides. On one occasion, after Ms. Diamond suggested that the parents interact with Shannon, Mr. Hiltabidel took out his keys and shook them in the baby's face throughout the hour visitation.
Ms. Diamond also stated that the parents began to arrive to the visitations later and later as time progressed. Sometimes, the parents would bring in breakfast or lunch and spend the time passing the child back and forth so that they could eat. Other times, she said that it appeared as if Mr. Hiltabidel was about to fall asleep during the visit. Occasionally, Mr. Hiltabidel would not be properly dressed or groomed, and, in spite of the fact that she had discussed the problem with him, Mr. Hiltabidel would smell bad.
Rubye Boone, a social service aid at CSB, testified that she teaches parenting classes and that she taught the Hiltabidels in their special needs class, a class that teaches basics such as bonding with a child, feeding, and changing diapers. Ms. Boone stated that a social worker recommended that the Hiltabidels attend the special needs class for a period twice the normal time so that the couple could learn the necessary skills to provide for a child. With regard to Ms. Hiltabidel, Ms. Boone stated that she never learned the basics and that, at the beginning of every class, she had to repeat how to diaper, bathe, and feed a baby. Despite the classes, Ms. Hiltabidel would put the baby's diaper on backwards or hold the baby improperly during feedings. She stated that Ms. Hiltabidel showed no significant improvement by the end of the classes.
Ms. Boone testified that, while Mr. Hiltabidel technically performed the tasks in a correct manner, he was often aggressive and needed to be told to be gentle around a baby. Further, Mr. Hiltabidel acted like he knew everything and became argumentative when he did not want to cooperate. Mr. Hiltabidel did not like to share his daughter with his wife and, on one occasion, had to sit outside the classroom so that Ms. Hiltabidel would get a chance to interact with the child. On two other occasions, Mr. Hiltabidel became so argumentative that he had to be put in "time out" so that he could calm down. If Shannon became upset, Mr. Hiltabidel would try to walk and jostle her, but this upset the child even more, so that, in the end, someone else would have to calm down the child.
Ms. Boone stated that the parents received certificates of completion because they attended the classes, attempted to perform satisfactorily, and made slight improvements. However, they did not satisfactorily complete the program. In the end, the classes were terminated because it was determined that the parents could not learn anything more through further instruction. In her opinion, the Hiltabidels did not demonstrate an ability to provide full-time care for a child.
Rochelle Sheppard testified that she works at Akron Pregnancy Services and that the Hiltabidels participated in parenting classes and received a certificate through the center. She stated that Ms. Hiltabidel is more withdrawn than her outspoken and gruff husband. Ray Halsey stated that he also works at Akron Pregancy Services and that he instructed Mr. Hiltabidel in an anger management class. Mr. Halsey testified that Ms. Hiltabidel attended the classes with her husband and that Mr. Hiltabidel, who was very outspoken, would speak on her behalf. He stated that they both received a certificate for their attendance in the program.
Russ Musarra, Ms. Hiltabidel's grandfather and legal guardian since childhood, testified that the Hiltabidels were married in November of 2000 but that he had known Mr. Hiltabidel since April of 1999. Mr. Musarra stated that he is available to help the couple by occasionally providing transportation, as they do not have a car, or providing groceries, to ensure that they have enough food. With reference to cleanliness, Mr. Musarra stated that he had talked to the couple about keeping their home clean and that he personally would be concerned about the safety of a child if the house remained in its current condition.
Mr. Musarra stated that the Hiltabidels share a genuine affection for each other and that they are doing the best that they can. Regarding finances, both he and CSS assist Ms. Hiltabidel. Ms. Hiltabidel receives a weekly paycheck while Mr. Hiltabidel's income is derived from SSI. When Mr. Musarra encouraged Mr. Hiltabidel to seek employment, Mr. Hiltabidel told Mr. Musarra that back problems prevented him from working.
When asked if he thought that Ms. Hiltabidel could take care of herself, Mr. Musarra stated that he believed so, with some guidance. With regard to Mr. Hiltabidel, Mr. Musarra stated that Mr. Hiltabidel used to live on the street and, therefore, could probably take care of himself as well. Mr. Musarra stated that he is committed to maintaining a relationship with the couple and providing them assistance but that he could not raise a baby in his house at his age. Mr. Musarra testified that the Hiltabidels never got a chance to fail as parents to Shannon. However, he also stated that he was not sure if Ms. Hiltabidel was capable of caring for a child or, similarly, if Mr. Hiltabidel could be left alone with a child.
Barbara Roth, a social worker at Summit County Children Services, testified that she was assigned to the Hiltabidel case in April of 2001. She stated that Mr. Hiltabidel has another child who is two or three years old but that he does not have any contact with that child or play a part in her life. Ms. Roth testified that, the first time she visited the Hiltabidel home, it was very dark and in a state of disarray. On her second visit, Mr. Hiltabidel answered the door in an upset manner, and Ms. Roth noticed Ms. Hiltabidel lying on the floor in a disoriented state. Ms. Roth stated that it was very warm in the house because the windows and drapes were pulled shut. When she asked Mr. Hiltabidel if he knew what was wrong, he replied that he did not know but that Ms. Hiltabidel had been on the floor in that state for approximately fifteen minutes. When Ms. Roth told him to call for assistance, Mr. Hiltabidel could not decide whether to use the cellular telephone or the telephone on the wall. Ms. Roth testified that she noticed that Mr. Hiltabidel's video game system was still on, and, when she asked him about it, he began to discuss at great length a video game that he was playing. According to Ms. Roth, when the paramedics arrived to care for Ms. Hiltabidel, Mr. Hiltabidel went out to get the mail. Then, as the paramedics were looking after her, Mr. Hiltabidel opened a cable bill and began to yell at Ms. Hiltabidel with regard to the bill. When the paramedics took Ms. Hiltabidel to the hospital, Mr. Hiltabidel again did not know what to do and waited for Ms. Roth to tell him to put on his shoes and shirt so that he could go to the hospital with his wife. Ms. Roth expressed great concern over the possibility that something could happen to Shannon in the future if the Hiltabidels were not able to handle arising emergency situations.
Ms. Roth testified regarding the Hiltabidels' case plan. The first case plan objective addressed the fact that the child's basic needs must be met on a daily basis. The second objective addressed the requirement that the Hiltabidels demonstrate age specific parenting techniques for their child. With regard to this objective, Ms. Roth noted that Ms. Hiltabidel had great difficulty in applying the skills that she was taught and that she could only focus on an immediate task, rather than consider her daughter's other needs. For example, Ms. Hiltabidel was recently attempting to change the baby's diaper and, not considering that the child is old enough to move around on the changing table, focused solely on the diaper. When the baby hit her head on the railing and began crying, Ms. Hiltabidel did not react but rather refocused her interest on the diaper. Additionally, Mr. Hiltabidel would also forget to pay adequate attention to the baby. For instance, one time he began to argue with Ms. Roth as he was putting the baby down. He was so focused on arguing that the baby hit her head on something. Other times, Mr. Hiltabidel would sleep during visitations or become so absorbed with the toys at the visitation center that he would ignore his daughter.
The third case plan objective addressed the Hiltabidels' emotional and mental health. With regard to this objective, Ms. Roth expressed concerned over Mr. Hiltabidel's failure to submit to an updated psychological assessment. She also testified that she has seen Mr. Hiltabidel be emotionally intimidating toward his wife, even blaming her for having their child taken away.
Ms. Roth testified that the Hiltabidels failed to successfully complete their case plan objectives and that no professional involved in the case ever felt that anything less than direct supervision at all times was appropriate. Ms. Hiltabidel did not show an ability to care for the child, while Mr. Hiltabidel had issues with anger and refused to take any advise. She reiterated her view that further classes would not help and that the parents have not demonstrated an ability to safely provide care for their child.
Mr. Hiltabidel testified that he has been married since November 20, 2000. He stated that his wife has recently been involved with career training. When asked if he also anticipated working in the future, he stated that he had not thought about it but that he would be interested in pursuing a career in the future. Mr. Hiltabidel stated that he has another child with a different woman but that he has not seen the child since 1997 due to a court order prohibiting all contact. He stated that he does not know why the court would issue such an order.
Mr. Hiltabidel testified that he had prior childcare experience in his life because he had babysat in the past; however, he stated that he has learned a few new things in his parenting classes and elaborated on what he learned. Mr. Hiltabidel stated that, although he has not tried to get treatment, he has a sleeping disorder that prevents him from falling asleep. He stated that he usually falls asleep between 3:00 and 5:00 a.m., waking up by noon or 1:00 p.m. He testified that his disorder would not affect the baby because he could sleep with a monitor or wake up at 7:00 a.m., even if it meant only getting two hours of sleep. Mr. Hiltabidel admitted that the disorder had caused him to not only miss a couple of appointments but also visitations with his daughter.
Mr. Hiltabidel stated that he felt that he had been prepared to be a full-time parent when his daughter was born. Further, he testified regarding the incident when Ms. Hiltabidel was taken to the hospital. He stated that the windows were closed and the binds were drawn to prevent burglaries but that he had been running fans in the house. He disputed Ms. Roth's testimony and asserted that he had stopped playing video games to tend to Ms. Hiltabidel with ice packs and cold rags. He stated that he had not gotten an opportunity to call for help when Ms. Roth arrived. Mr. Hiltabidel stated that, despite what Dr. Hiremath believes, he takes his medicine as prescribed. However, the Depakote is only marginally helpful to him.
Mr. Hiltabidel testified that he has done everything requested by CSB, including anger management classes. He said that, while he does not know the baby's medical needs or feeding or sleep schedule, he could get advice from the baby's foster parents or a doctor. For example, Mr. Hiltabidel stated that, were the baby to vomit more than once, he would take her to the hospital. He stated that, should he get custody of his daughter, he would permit CSB to make weekly visits to his house.
Ms. Hiltabidel testified that she and her husband have secured housing through the AMHA. She stated that, while she and Mr. Hiltabidel sometimes have bad days, their relationship has gone well. Ms. Hiltabidel testified regarding the birth of her daughter and stated that she thought everything had gone fine but that the police arrived to remove the child within three hours of the couple taking their daughter home. Ms. Hiltabidel stated that she had suicidal thoughts in the past but not anymore. Rather, she felt that she could take care of the child now, especially with the help of her grandparents who raised her when she was a child. She stated that she gets nervous when people watch her with her child but that, if she and her husband had custody, she would permit CSB's continued involvement with her family.
Patricia Banks, Mr. Hiltabidel's mother, testified that CSB removed Mr. Hiltabidel from her home when he was a child due to her problems with alcoholism. She stated that Mr. Hiltabidel had spent time in therapeutic foster homes and at Parmadale. Ms. Banks stated that Mr. Hiltabidel was a child with violent tendencies, though he only harmed himself and not others. In fact, Mr. Hiltabidel was so disruptive and uncontrollable that Ms. Banks asked him to leave her house at the age of eighteen. Ms. Banks stated that he has become more controlled and responsible since he met Ms. Hiltabidel.
Ms. Banks testified that the Hiltabidels were happy when they found out that they were going to have a child and tried to get things ready for a child, even asking Ms. Banks for advice. Ms. Banks stated that she attended Shannon's birth and had planned to stay for at least two weeks after the birth to attend to Ms. Hiltabidel's needs. Ms. Banks stated that she felt that the Hiltabidels are capable of caring for their daughter and that she and her daughter would be able to offer support to the couple.
Michelle Curtis, executive secretary for the Recovery Project, testified that she met Ms. Hiltabidel at Choices, a social center for people with counseling needs. Ms. Curtis stated that Ms. Hiltabidel babysat for her child when the child was five years old. Though the Hiltabidels' house was messy, Ms. Hiltabidel cleaned up before the child arrived. Ms. Curtis testified that she would have no concerns with allowing the Hiltabidels to care for her child now. Lastly, Lou Incorvati, the Guardian ad litem ("GAL"), testified that he thought it in Shannon's best interest to award permanent custody to CSB and explained the reasons for his recommendation.
Upon review, this court finds that the juvenile court did not err in concluding that it was in the best interest of the child to be placed in the permanent custody of CSB. We find substantial evidence in support of that judgment, and, furthermore, the evidence weighed in favor of termination. Additionally, based upon the relevant evidence before the juvenile court, this court finds that the junvenile court did not err in concluding that the child cannot or should not be placed with Mr. Hiltabidel within a reasonable time. The judgment of the juvenile court is supported by the weight of the evidence. Mr. Hiltabidel's first assignment of error is overruled.
 B. Second Assignment of Error "THE TRIAL COURT'S DECISION TO PERMIT HEARSAY AND DOUBLE HEARSAY EVIDENCE FROM THE GUARDIAN AD LITEM WAS CONTRARY TO LAW AND PREJUDICIAL TO APPELLANT."
In the second assignment of error, Mr. Hiltabidel asserts that the trial court erred in admitting hearsay evidence over the objections of his trial counsel. We disagree.
Juv.R. 34(I) provides that, in a hearing on a motion for permanent custody, the rules of evidence shall apply. See In re Reeves (June 7, 2000), 9th Dist. Nos. 19650, 19669, 19672-4, 19705-7. "A `trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and [a party] has been materially prejudiced thereby, [an appellate] court should be slow to interfere.'" (Alterations sic.) Packard v. Packard (Nov. 22, 2000), 9th Dist. No. 19870, quoting State v. Hymore (1967), 9 Ohio St.2d 122, 128. "The erroneous admission of hearsay evidence is harmless if additional information, separate and apart from the erroneously admitted evidence, has been offered to prove that which the challenged evidence was offered to prove." In re Reeves, supra.
Mr. Hiltabidel refers to several alleged hearsay statements made by the GAL, asserting that it was error to introduce them at trial. Upon reviewing the evidence, with the exception of two of the statements made by the GAL, this court finds that Mr. Hiltabidel did not object on hearsay grounds to the trial court's admission of the remaining statements. With regard to those statements, as the testimony was not objected to at trial on hearsay grounds, Mr. Hiltabidel waived any error on appeal. See In re Stacey S., 136 Ohio App.3d 503, 1999-Ohio-989, at ¶ 56; see, also, In re Hoffman, 5th Dist. No. 2001CA00207, 2001-Ohio-1816.
Additionally, without deciding whether the trial court erred in admitting the GAL's statements, this court notes that even were we to find error, Mr. Hiltabidel has not asserted how the statements prejudiced him. Further, this court does not discern any prejudice. In the first statement, the GAL reported that Ms. Boone told him that the Hiltabidels would not be suitable parents based upon their inability to implement the parenting skills that they had been taught. However, Ms. Boone testified that the Hiltabidels did not satisfactorily complete the program and that, in the end, classes were terminated because it was determined that the parents would not learn anything else through additional instruction. Ms. Boone also testified that, in her opinion, the Hiltabidels did not demonstrate an ability to provide full-time care for their child.
In the second statement, the GAL reported that Ms. Shepard told him that she would not recommend that Mr. Hiltabidel receive custody in the absence of further anger management classes. Mr. Hiltabidel's need to take additional anger management classes was addressed, without objection, during Ms. Roth's testimony. In such testimony, Ms. Roth stated that she recommended that Mr. Hiltabidel continue to seek anger management and, further, that Mr. Hiltabidel had recently approached her with regard to finding additional classes that he could take for the problem.
Therefore, even if it were true that the trial court admitted inadmissible hearsay, there was separate and additional evidence offered to prove that which the challenged evidence was offered to prove. Further, there was enough admissible evidence to support the trial court's granting of the motion for permanent custody. Accordingly, Mr. Hiltabidel has not demonstrated prejudice, and the introduction of the statements at issue would constitute harmless error in this case. Mr. Hiltabidel's second assignment of error is without merit.
 C. Third Assignment of Error "THE GUARDIAN AD LITEM FAILED TO PROPERLY PERFORM HIS DUTIES AS REQUIRED BY R.C. § 2151.281(B)(1) TO THE PREJUDICE OF APPELLANT."
In the third assignment of error, Mr. Hiltabidel asserts that the GAL failed to remain neutral and detached by improperly acting as an attorney supporting CSB's motion for permanent custody. We disagree.
An appellant bears the burden of affirmatively demonstrating error on appeal. Ivery v. Ivery (Jan. 12, 2000), 9th Dist. No. 19410. Pursuant to App.R. 12(A)(2), this court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based. Moreover, the brief of the appellant must contain both argument and law, along with citations to the authorities, statutes, and parts of the record upon which an appellant relies. App.R. 16(A)(7).
In his third assignment of error, Mr. Hiltabidel generally avers that the GAL failed to properly perform his duties, as he failed to act in a neutral and detached manner. Mr. Hiltabidel mentions in passing how his counsel objected to the admittance of hearsay as addressed in the second assignment of error; however, he fails to argue how this portion of the record supports his third assignment of error. As Mr. Hiltabidel neither asserts specific reasons why he assigns error to the GAL's performance nor cites to parts of the record to support this assignment of error, his assertions cannot be considered sufficient to carry his burden of proving that the GAL failed to properly perform his duties.
Accordingly, Mr. Hiltabidel's third assignment of error is overruled.
 III.
Mr. Hiltabidel's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
SLABY, P.J., WHITMORE, J. CONCUR.