DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal is from the July 26, 2002 judgments of the Sandusky County Court of Common Pleas, Juvenile Division, which terminated the parental rights of appellant, Jason B., and appellant, Annette B., and granted permanent custody of their four children, Joshua B. (born 9/26/91), Justin B. (born 12/12/96), Dakota B. (born 2/10/98), and Logan B. (born 5/13/99), to appellee, the Sandusky County Department of Jobs and Family Services. Upon consideration of the assignments of error, we affirm the decision of the lower court.
 {¶ 2} Appellant mother asserts the following assignments of error on appeal:
 {¶ 3} "1. The Trial Court committed reversible error to appellant's prejudice when it failed to appoint counsel for appellant's alleged abused and dependent children pursuant to Juv.R. 4(A) and R.C.2151.352.
 {¶ 4} "2. The Trial Court abused its discretion because its decision was against the manifest weight of the evidence."
 {¶ 5} Appellant father asserts the following assignment of error on appeal:
 {¶ 6} "The trial court committed reversible error to the appellant's prejudice when it failed to appoint counsel for the alleged abused/dependent children pursuant to Juvenile Rule 4(A) and Ohio Revised Code Section 2151.352."
 {¶ 7} On March 31, 2000, appellee filed a complaint pursuant to R.C. 2151.27. Appellee alleged that Joshua B., the son of appellants, was an abused and dependent child because 1) on March 24, 2000, the father admitted hitting the child with a belt, leaving marks on the child's thighs; 2) there was a past unsubstantiated investigation of abuse (hitting with a belt) in Huron County; and 3) on March 28, 2000, the police were called to the home because of conflict between appellants. Appellee sought emergency temporary custody, a temporary order to investigate, child support, and a determination that appellee had made reasonable efforts to prevent removal or that such efforts were not necessary. The agency also sought emergency temporary custody of appellants' three other children as abused and dependent children based upon allegations that Joshua B. was abused.
 {¶ 8} The court appointed a guardian ad litem to represent the children. However, an attorney was not appointed to represent any of the children. Attorneys were appointed to represent appellants independently.
 {¶ 9} After a combined adjudicatory and dispositional hearing, a judgment entry was entered on September 7, 2000. Appellants agreed to a finding of dependency. The allegation of abuse against Joshua B. was dismissed. All other allegations of the complaint were admitted by appellants. Appellants agreed to a disposition of temporary custody to appellee. Appellants also agreed to the terms and requirements of the case plan filed on April 26, 2000, except that the allegation that Joshua B. had previously attempted suicide was stricken. The court also found that appellee had made reasonable efforts to prevent removal of the children from the home.
 {¶ 10} On October 4, 2001, appellee moved for permanent custody of the children. Appellee alleged that appellants: 1) had failed to substantially remedy the conditions that cause the children to be removed; 2) committed abuse, caused the children to suffer neglect, or allowed the children to suffer neglect since the date of the original complaint; and 3) demonstrated a lack of commitment toward the children by failing to regularly support, visit, or communicate with them or some other action which indicated an unwillingness to provide an adequate permanent home for the children. Furthermore, appellee alleged that the mother had failed to comply with the case plan because she: 1) failed to demonstrate appropriate discipline methods; 2) pled no contest to an order to show cause regarding her non-compliance with the case plan; 3) lacked stable housing as of October 5, 2001 and she was living out of her car; 4) had missed at least two weeks of visitation since September 10, 2001 (the date of the contempt order); 5) had moved several times and never lived at the location she told the caseworker; and 6) had not contacted her caseworker.
 {¶ 11} The mother in her first assignment of error and the father in his sole assignment of error on appeal contend that the trial court erred by failing to appoint counsel to represent all of the children when the complaint alleged that they were abused children.
 {¶ 12} If a child is taken into custody under allegations of abuse, the child is entitled to legal representation. Juv.R. 4(A); Juv.R. 2(X); R.C. 2151.352; and State ex rel. Asberry v. Payne (1998),82 Ohio St.3d 44, 48. This right attaches when a complaint is filed or the child is taken into custody under Juv.R. 6. Juv.R. 4(A) and In theMatter of Stacey S., Stephanie S., Jennifer B., James B., Rachel S.,Rebecca S., (1999), 136 Ohio App.3d 503, 513. Unless there is a conflict of interest between the roles, an attorney can be appointed to serve both as the child's legal representative and as the guardian ad litem. Juv.R. 4(C); R.C. 2151.281; and In the Matter of Williams, 11th Dist. App. Nos. 2002-G-2454 and 2002-G-2459, 2002-Ohio-6588, at ¶ 19. The guardian's role is to advise the court as to what action would be in the best interest of the child. However, the attorney's role is to represent the child's wishes to the court. Id. The ultimate issue, however, is whether the violation of the right to counsel resulted in prejudice to the children or the parents. In the Matter of Stacey S., Stephanie S.,Jennifer B., James B., Rachel S., Rebecca S., supra at 515.
 {¶ 13} Clearly, the complaints in this case alleged that the children were abused based upon the specific allegation that Joshua B. was abused. Therefore, we agree with appellants that the trial court erred by failing to appoint counsel to represent the children. However, the allegations regarding the abuse of Joshua B. were dismissed at the adjudication hearing by agreement of the parties. Furthermore, the court attempted to determine each child's wishes by conducting an in camera interview of the children. The court found that the three youngest children could not understand the process sufficiently to express their desires. However, the court did determine that the oldest child clearly wished to be adopted into a stable home even if it meant that he would be separated from his siblings. Therefore, the failure to appoint counsel did not prevent the court from knowing the wishes of the children. Therefore, we find that the court's error was rendered harmless and that no prejudice resulted to the parties.
 {¶ 14} Both the mother's first assignment of error and the father's sole assignment of error are found not well-taken.
 {¶ 15} The mother argues in her second assignment of error that the trial court erred in granting appellee permanent custody of the children because there was insufficient evidence to establish that it was in the best interest of the children to do so.
 {¶ 16} In this case, the agency removed the children from the home on May 29, 2000, and retained temporary custody until August 13, 2001. The agency regained temporary custody on October 4, 2001 and retained temporary custody until the date it filed is amended motion for permanent custody on January 16, 2002. Therefore, the agency moved for permanent custody of the children pursuant to R.C. 2151.413(D)(1).
 {¶ 17} On a motion for permanent custody based upon R.C.2151.413(D)(1), the court must "determine if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion." R.C. 2151.414(A)(1). The trial court must find by clear and convincing evidence that: 1) "it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody" and 2) that the agency has had temporary custody of the child for "twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999." R.C. 2151.414(B)(1). In making its determination, the court must "consider all relevant factors, including, but not limited to, the following:
 {¶ 18} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 19} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 20} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 21} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 22} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D).
 {¶ 23} Pursuant to R.C. 2151.414(E)(7)-(11), if the court finds that any of the following facts "exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 24} "(7) The parent has been convicted of or pleaded guilty to one of the following:
 {¶ 25} "(a) An offense under section 2903.01, 2903.02, or 2903.03of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
 {¶ 26} "(b) An offense under section 2903.11, 2903.12, or 2903.13of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 {¶ 27} "(c) An offense under division (B)(2) of section 2919.22 ofthe Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
 {¶ 28} "(d) An offense under section 2907.02, 2907.03, 2907.04,2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 {¶ 29} "(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
 {¶ 30} "(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
 {¶ 31} "(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section2151.412 [2151.41.2] of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
 {¶ 32} "(10) The parent has abandoned the child.
 {¶ 33} "(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 [2151.35.3] or2151.415 [2151.41.5] of the Revised Code with respect to a sibling of the child."
 {¶ 34} The clear and convincing evidence standard applies to both motions filed pursuant to R.C. 2151.353(A)(4) or R.C. 2151.414(B)(1)(d).In the matter of: Nicholas Bruce Lee R., 6th Dist. App. No. H-02-053,2003-Ohio-1414, at ¶ 19. This standard also applies to the determination of whether termination of the parental rights would be in the best interest of the child. R.C. 2151.414(A)(1) and In the Matter ofJoseph P., 6th Dist. App. No. L-02-1385, 2003-Ohio-2217, at ¶ 45. The standard is met by evidence that is sufficient to establish in the mind of the trier of fact a "firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469,
paragraph three of the syllabus. On appeal, this court will not reverse the trial court's judgment if there is some competent and credible evidence which supports the trial court's factual findings. In re Wise
(1994), 96 Ohio App.3d 619, 626, and C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, syllabus.
 {¶ 35} When an agency seeks permanent custody pursuant to R.C.2151.414(B)(1)(d) the court need not find that the child cannot or should not be placed with either parent within a reasonable time as required by R.C. 2151.414(B)(1)(a). The only consideration is the best interest of the child. In the Matter of Workman, 4th Dist. App. No. 02CA576,2003-Ohio-2221, at ¶ 44.
 {¶ 36} The following evidence was submitted in this case. In July 1998, the agency investigated allegations that the children had been left home alone at ages six, one and one-half, and five months (Joshua B., Justin B., and Dakota B.). The mother stated that she had left the children alone for only a few moments to borrow milk from the neighbor.
 {¶ 37} The agency again investigated allegations in August 1998, that the father had hit Joshua B. with a belt. The agency offered services, but did not file a complaint. The father left the home so that the children did not have to leave. The record indicates that appellant father completed services sufficient to return to the home. The mother also attended counseling.
 {¶ 38} The agency investigated a third referral in September 1999, because of allegations that Joshua B. had bruises in the kidney area. There were also allegations that the other children were being left in soiled diapers for extended periods of time. These allegations could not be substantiated.
 {¶ 39} This present case began with a referral to the agency on March 31, 2000, with allegations that Joshua B. had been hit with a belt by the father hard enough to leave marks. The father verbally admitted hitting both Joshua B. and Justin B. with a belt. Because of concerns that the mother had allowed the father to have contact with the children after the August 1998 incident, she was not given temporary custody of the children this time. At this time, the children were ages eight, three, two, and ten months.
 {¶ 40} Instead, the children were placed in foster care. Visitation was at the Village House from April 2000 to August 2000. Supervised visits were permitted in the home from August to September 2000. Visitation progressed to overnight, and then extended visits in October 2000. A few concerns arose during these visits, but were attributed to the father who was caring for the children while the mother worked. The mother left the home in December 2000, and appellants eventually divorced. After the mother left the home, the father would let the mother have some visitation. However, the agency terminated the unsupervised visits with the mother because of her unstable housing and transportation. The father's girlfriend moved into the family home shortly thereafter with three children of her own. They were married in July 2001.
 {¶ 41} While the agency was required by law to move for permanent custody in May 2001, it still had a goal of reunification. Therefore, in June 2001 the children went with the father and their step-mother for an extended visit of 60 days. In August 2001, the agency withdrew its motion for permanent custody and retained only protective supervision of the children. The agency was considering closing the case. However, in October 2001, there was a domestic violence incident between the father and stepmother and both were arrested. The children were returned to the temporary custody of the agency and placed in foster care. The agency again moved for permanent custody of the children. However, because the court could not timely hear the motion for permanent custody, appellee filed another motion for permanent custody on January 16, 2002.
 {¶ 42} The agency received another referral in January 2002, regarding a bruise observed on Jason B.'s thigh in September 2001. At that time, Joshua B. had stated that he must have fallen. However, in January 2002, Joshua B. said that his father had hit him when they were wrestling. The caseworker could not substantiate the allegation because appellants were then represented by counsel and advised not to speak to the caseworker.
 {¶ 43} The following evidence was presented at the hearing on the January 16, 2002 motion for permanent custody. Hamann-Lenke, an agency caseworker, testified that she developed the case plan that the mother was required to complete. It provided that the mother needed to protect the children from future abuse; participate in the therapy programs for Joshua B. and Justin B.; attend parenting classes and apply the principles learned; provide a structured home with rules and natural and logical consequences; use appropriate discipline skills; show increased stress coping abilities; attend individual counseling to address stress and coping skills and joint counseling if recommended; and participate in an Infant Parenting program. Hamann-Lenke testified that the agency's main concern with the mother at the time of the hearing on the motion for permanent custody was the fact that the mother could not provide for the children. The mother could not get HUD housing without custody of the children and she could not have custody of the children without a stable home. The mother was still unemployed and was living with someone else.
 {¶ 44} Hamann-Lenke further testified that the parents completed the infant parenting program. The mother finished a children parenting program and then was required to repeat the program. However, the instructor, Linda F. Ackerman, testified that while the parents completed the infant parenting classes, they did not properly participate because they were too guarded and there was no real growth. While the mother also had previously taken the class and received a successful completion certificate, Ackerman believed that every instructor has different policies regarding the need for participation.
 {¶ 45} The mother also attended individual counseling until the case was closed. There was insufficient evidence to explain why the case was closed. The mother's psychotherapist, Teresa Briceno, testified that appellant mother was a client from June 2001 until September 2001. After six visits, Briceno was unable to contact appellant mother to continue therapy to help the mother plan how to cope with her problems. However, Briceno believed that their last conversation could have been interpreted as meaning that the case should be closed. She had told the mother that she would talk to the supervisor about closing the case.
 {¶ 46} After the parents separated in December 2000, the mother lived in various locations for short periods of time. She was never able to obtain stable employment or housing. The mother lived in a trailer park; a boyfriend's house in Gibsonburg, Ohio, on several different occasions; a friend's house in Fremont, Ohio; a campground in Fremont, Ohio; in her car at a friend's home; a homeless shelter; her mother's house in Lorain, Ohio; a friend's house in the state of New York; and finally with her current boyfriend in Port Clinton.
 {¶ 47} Following a motion filed in June 2001, the mother was found in contempt in September 2001 for failure to comply with case plan services. Following the hearing, the mother was supposed to leave the court and immediately set up appointments with Catholic Charities, but she failed to do so.
 {¶ 48} Ellen Gonyer Stoudinger, a Training Specialist with Work Connections, testified that she took over appellant mother's case in July 2001, but that problems arose in August due to appellant's mother's homelessness. The mother was not able to meet with Stoudinger. She instructed the mother that it was the mother's responsibility to reestablish in-home services. Since the mother failed to do so, the case was closed in October 2001. When Hamann-Lenke transferred the case to another caseworker in October 2001, she did not know where the mother was living.
 {¶ 49} In December 2001, the mother was living at the Liberty Center for the homeless in Fremont, Ohio. Stoudinger met with the mother and stressed the need for her to consistently comply with the case plan. She worked with her intensely that day to get employment. Additional meetings were planned, but the mother never contacted the agency again. The case was closed again in January 2002.
 {¶ 50} Hamann-Lenke testified that the mother visited fairly consistently, missing only 11 out of 42 scheduled visits. The missed visits were generally due to transportation problems and the mother's work schedule. While the agency provided for transportation, the mother had to make arrangements ahead of time.
 {¶ 51} Furthermore, during her visits, Hamann-Lenke testified that the mother acted appropriately and was caring, loving, and attentive. She had no concerns about the physical safety of the children with the mother. The only reason the mother had supervised visits was because she had no home. Stoudinger testified that she witnessed one visitation and thought that the children were a little out of control playing with their food.
 {¶ 52} Angela Arlene Butscher, a health department employee who gives parental support at the School of Hope, testified that the mother only came twice to the school to participate in Logan B.'s program from October 2001 until March 2002. Bonnie Loparo, School of Hope Early Intervention Specialist, testified that she never saw any concerns with the mother. She observed the mother with Logan B. at least 20 times since her return to the area and previously with Dakota only a few times.
 {¶ 53} Sherry Scott-Ward, the current caseworker, testified that she began working at the agency in September 2001, and took over the case in October 2001. She testified that the mother visited the children once in December 2001, and then had no visitation from January 2002 until March 7, 2002 while she was living in New York. The mother did not correspond with the children nor send birthday or Christmas presents. She merely left the agency a note on January 14 of her new address, but no phone number. She refused to meet with the caseworkers before her departure. Justin B. would give Scott-Ward pictures to mail to his mother and they were not returned.
 {¶ 54} Scott-Ward testified that the mother called the agency on March 7, 2002, indicating that she had moved back to the area and wanted to start visitations again. When she called, she stated that she was living with a man in Port Clinton to whom she was engaged. The mother has attended every visit since March 14, except for once when the county transportation did not show up and once when she arranged to miss a visitation in order to visit her mother who had surgery. Since her return, the mother has also attended Logan B.'s preschool at the School of Hope every other week as scheduled and even on the other weeks when the father could not make it. She also started back in counseling in May. Scott-Ward testified that the main problem remaining with the mother is that she is not employed and not financially independent to care for the children. Scott-Ward believed that the mother will continue in the same unstable pattern as before.
 {¶ 55} Even though the mother had been permitted to have unsupervised visits in September 2001, when she was not complying with the case plan, the agency would not let her have them in 2002. Scott-Ward explained that the earlier unsupervised visits were permitted because of the assumption that the mother would go back into counseling and work services. Scott-Ward informed the mother that this time visitations would increase with case plan progress. Because of her past conduct, the agency would not make the assumption that the mother would progress on her case plan. Scott-Ward testified that as of the date of the hearing, the mother had not complied with the case plan.
 {¶ 56} In order to have unsupervised visitation, a background check of the mother's boyfriend had to be done as well as a home safety audit. Following the mother's request on March 7, 2002, Scott-Ward prepared a background check of the mother's boyfriend and sent releases for signatures on April 19, 2002. These were returned to the agency on April 23. Scott-Ward requested the background check on May 2 and received the results at the end of May. The background check did not reveal any negative information about the boyfriend. While Scott-Ward could have completed a home safety audit while waiting for the background check, she did not. As of the middle of June, she had not yet set up an appointment for completing this prerequisite for unsupervised visitation. She further testified that even if the home safety audit was acceptable, she would need to talk to her supervisor and the therapists to determine if unsupervised visitations would be allowed.
 {¶ 57} Kerri Moyer, an investigator for Sandusky County Child Support, testified that appellant mother is in arrears $2,627.17 in child support.
 {¶ 58} Jeff Vogel, a therapist for Firelands, testified that he saw Joshua B. from February 2002 until the time of the hearing. He is currently working on behavioral and emotional goals, such as not lying, not sneaking or concealing things, and building self-esteem. Vogel testified that Joshua B. was diagnosed with ADHD by someone else and takes medication. Vogel had not observed any ADHD symptoms, but believed that this may be due to the medication. He diagnosed Joshua B. with an Adjustment Disorder, anxiety, and a depressed mood. Vogel attributed these problems to the stress of two foster homes, the permanent custody issues, and past abuse. He believed that Joshua B. is doing pretty well. However, Vogel had no opinion on the effect that the termination of the parents' rights would have on Joshua B. as he had not even inquired about Joshua B.'s feelings for his parents.
 {¶ 59} Rosemary L. Wensinger, foster parent to three of the children, testified that when Joshua B. first came to her home he was very quiet, had low self-esteem, had no confidence, and his academic skills were pretty low. Joshua B. started counseling. Wensinger tried to get Joshua B. tested for learning disabilities, but the school refused at first because it believed that his problems were all behavioral in nature. The following year, he was tested and placed in a learning disabled class for some subjects. Joshua B. did well in this class but not in the mainstream classes. She also observed that Joshua B. had a lot of trouble with behavior at school during the time that his father was given extended unsupervised visits. Joshua B. would not do the work at school and acted like he did not have to obey. He also had trouble readjusting after visiting his father. She also observed that since the children returned to her house in October 2001, Joshua B.'s low self-esteem was worse again and the younger brothers treated him badly.
 {¶ 60} Wensinger also testified that Joshua B. was initially tested for ADHD and was put on Aderol because he seemed very anxious. However, the medication was removed in December 2001, because it had no effect.
 {¶ 61} Wensinger testified that Logan attends the School of Hope for Early Intervenion with the parents. She does not know what goes on there. She takes him for speech therapy at Memorial Hospital. Dakota also has speech problems and sees a therapist.
 {¶ 62} Wensinger testified that when the mother lived nearby, Wensinger would let the mother take the children on Sunday to go to church and that this arrangement worked out well and the children enjoyed the visits. But, when the mother moved more than walking distance away, she was not able to pick the children up any more.
 {¶ 63} June Rich, a foster parent, testified that she had Justin B. in her home from March 2000 until June 2001, and again from October 2001 to the present. Justin was three when he first came to her home. He started preschool in the fall of 2001. He also started counseling in February 2002, to deal with behaviors that arose after visitations with his father. These behaviors have disappeared with counseling three or four times and a positive reward system. During the winter of 2001-2002, Justin B. missed his mother a lot. Rich told him that his mother lived too far away to visit. After the mother's return to the area in March 2002, she has been visiting. Justin looks forward to the visits. There is never any behavioral changes after visitation with the mother.
 {¶ 64} Melanie Dinan, children's services adoption placement director, testified that they have done 10 home studies of potential adoptive homes and that two are superior and will keep the children together. The children should be placed in an adoptive home within three to six months. Wensinger testified that she has no intention of adopting the children.
 {¶ 65} Finally, the guardian ad litem submitted his recommendations. At first, he recommended that the mother's parental rights be terminated because she had been absent throughout most of the case, was "inconsistent in attending services and has not maintained stable housing." After the mother returned to Ohio, the guardian ad litem submitted a revised recommendation noting that the mother has an "appropriate, loving relationship with her children," and that the children enjoyed being with her. However, despite the bond between the mother and the children, the guardian recommended that her parental rights be terminated because the stability of her current relationship and the stability of her housing is uncertain given her past conduct. The guardian noted however that this decision was made after he had "struggled with the issues" and the "testimony presented at the permanency hearing."
 {¶ 66} On appeal, the mother contends that the court concluded that R.C. 2151.414(B)(1)(a) applied to this case. However, the court clearly found in Paragraph 2, 10, 14, and 15 of the adopted Magistrate's Decision and Recommendations that it found that R.C. 2151.414(B)(1)(d) applied to this case. After making that finding, the court unnecessarily make factual findings and a determination that the children could not be placed with either parent within a reasonable period of time. We find that these findings were irrelevant in this case.
 {¶ 67} Finally, the court made specific findings as to whether permanent custody would be in the best interest of the children. Those findings were: that the parents had a "violent, turbulent marital relationship due to domestic violence which resulted in their marital relationship ending when [the mother] left the marital home;" "that all four children have excellent relationships with their foster parents and appear well adjusted in their foster homes;" that Joshua B. "clearly communicated his desire to be adopted into a stable home environment even if it mean [sic] separation from his siblings;" that the other three children were too young to express their wishes in this matter; that the guardian ad litem recommended that permanent custody be granted to appellee; "that there are no relatives able or willing to assume a parental role and to take custody of the children;" that there are ten potential adoptive homes willing to consider adopting all four children; and that there was "no other alternative placement."
 {¶ 68} The mother argues that evidence did not support the finding that it would be in the best interests of the children to terminate her parental rights and that she was deprived of her parental rights solely because she was homeless. We disagree. There was ample evidence that the mother's homelessness and unstable relationships reflected a pattern of behavior that she is either unwilling or is unable to correct. Therefore, we find that there was competent and credible evidence to support the trial court's finding that clear and convincing evidence had been presented to establish that an award of permanent custody to appellee was in the best interest of the children. The mother's second assignment of error is not well-taken.
 {¶ 69} Having found that the trial court did not commit error prejudicial to appellants, the judgments of the Sandusky County Court of Common Pleas, Juvenile Division, are affirmed. Pursuant to App.R. 24, appellants are hereby ordered to equally share the costs of this appeal.
 JUDGMENT AFFIRMED.
Peter M. Handwork, P.J., Richard W. Knepper, J., and Mark L. Pietrykowski, J.