[Cite as *In re L.T.*, 2016-Ohio-4752.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re L.T., B.A., Q.A., N.T.

Court of Appeals No. H-15-022
H-15-023
H-15-024
H-15-025
H-15-026
H-15-027
H-15-028
H-15-029
H-15-030
H-15-031

Trial Court No. DNA 2015 00024
DNA 2015 00025
DNA 2015 00022
DNA 2015 00023

**DECISION AND JUDGMENT**

Decided: June 30, 2016

* * * * *

Reese Wineman for appellant, M.T.

Paul D. Dolce, for appellant, D.A., Jr.

Matthew J. Hawley, for appellants, D.A., Sr., and E.A.

Daivia S. Kasper, Huron County Prosecuting Attorney, and Dina
Shenker, Assistant Prosecuting Attorney, for appellee.

* * * * *

**YARBROUGH, J.**

## I. Introduction

{¶ 1} Appellants, M.T. ("mother"), D.A., Jr. ("father"), and D.A., Sr. and E.A. (grandparents), appeal the judgment of the Huron County Court of Common Pleas, Juvenile Division, terminating mother's and father's parental rights and awarding permanent custody of the children, L.T., B.A., Q.A., and N.T. (the "children"), to appellee, Huron County Department of Job and Family Services ("JFS"). For the reasons that follow, we affirm.

### A. Facts and Procedural Background

{¶ 2} On January 6, 2015, the juvenile court issued an order granting legal custody of the children to grandparents in case Nos. DNA 2013-82 through 2013-85. Three months later, JFS was asked to assist local law enforcement, led by detective sergeant Josh Querin, with the execution of a search warrant at grandparents' residence.

{¶ 3} Upon gaining entry into the mobile home, Querin noted that there were five adults living inside the residence, including mother, father, grandparents, and father's brother. In addition to the adults, there were five children living in the mobile home, including L.T., B.A., Q.A., N.T., and another child, J.G., who "is a friend of the family." Querin testified that B.A., Q.A., and N.T. were sleeping in bunkbeds inside the parents' bedroom. L.T. was found inside the grandparents' bedroom.

{¶ 4} According to testimony offered at the dispositional hearing, the juvenile court had previously issued a judgment entry in a prior case, forbidding grandparents

2.

from granting mother, father, or father's brother access to the residence. Pursuant to the judgment entry, mother and father were only to be allowed to visit the children for two hours during the day. Despite the court order, grandparents "felt bad for them and they let them move back in * * * because of * * * not having anywhere to go."

{¶ 5} When asked at the dispositional hearing about his observations concerning the residence, Querin testified that the residence was in a "deplorable" condition. Querin's testimony was echoed by a JFS worker, Kelly Phelps, who observed that

> [L.T.'s] bouncy seat was covered with a brown substance all over.
> * * * The other smell was very bad from sippy cups. [Q.A.'s] bed was
> * * * next to where a shower/bathtub used to be and the shower/bathtub
> was filled with boxes that [were] approximately my height. * * * [O]n the
> edge of that bathtub, right next to his bed, were several sippy cups in
> varying degrees of rotten milk or juice or whatever it was that was clumped
> up in clumps in the cups that we could see.

Phelps testified that there were more dirty "sippy cups" in the living areas, as well as dirty floors with a sticky substance on the carpets.

{¶ 6} While searching the residence, Querin discovered,

> numerous doses of heroin found under * * * the mattress that [father] and
> [mother] were living on. There was an uncapped syringe found in the
> dresser in the same bedroom that the kids would have had access to. And

3.

there were numerous syringes, spoons, [and] packaging material to

distribute heroin found in the bedroom – or in the bathroom.

In addition to the drugs and paraphernalia found in and around mother and father's bedroom, half of an orange pill, later determined to be Suboxone, was also located inside a safe in grandparents' bedroom.

{¶ 7} After searching the residence, Querin interviewed father, who admitted to abusing and selling heroin in New London. More specifically, father acknowledged that his heroin addiction cost him between $100 and $150 per day. Father went on to explain that mother became involved in the distribution of the heroin after he returned to work. He described mother's heroin consumption as being similar to his own. Ultimately, mother and father were arrested and charged with felony level drug offenses. They each eventually entered guilty pleas to various offenses, including trafficking in heroin and possession of heroin. Mother was sentenced to a community based correctional facility, and father was ordered to serve a 28-month prison sentence. Mother and father were incarcerated during the pendency of this case.

{¶ 8} Three days after the search warrant was executed, JFS filed a complaint in the current case, alleging dependency and neglect, and moving the court for a shelter care hearing. On the same day the complaint was filed, a shelter care hearing was held, after which JFS was awarded temporary custody. A case plan was filed on May 7, 2015, with the goal of adoption. On June 10, 2015, grandparents entered admissions to the

4.

allegations contained in the complaint, and the children were found to be dependent and neglected. Eight days later, JFS filed its motion for permanent custody of the children.

{¶ 9} A hearing on JFS's motion for permanent custody was held on August 31, 2015, September 1, 2015, and November 2, 2015. At the hearing, JFS called several witnesses in support of its motion. Mother testified, but no other witnesses were called on behalf of appellants.

{¶ 10} At the conclusion of the hearing, the juvenile court granted JFS's motion for permanent custody, finding that the children could not and should not be placed with father or mother within a reasonable period of time under R.C. 2151.353(A)(4) and R.C. 2151.414(E)(1) and (2), and that a grant of permanent custody to JFS was in the children's best interests under R.C. 2151.414(D). Subsequently, appellants filed their timely notices of appeal in case Nos. H-15-022 through H-15-031. These cases were subsequently consolidated on January 6, 2016.

## B. Assignments of Error

{¶ 11} On appeal, mother and father present one assignment of error each for our review. For their part, grandparents present two assignments of error. These assignments of error are presented as follows:

{¶ 12} Mother:

> The trial court below abused its discretion in finding that R.C. 2151.414(E)(1) should not apply upon an agency's request for permanent custody as an original disposition; the allowance of no meaningful

5.

reunification plan with the mother and her children; and the, clear, denial of appellant/mother's due process rights by the granting of permanent custody to the agency.

{¶ 13} Father:

The trial court's decision to terminate parental rights and responsibilities was not supported by clear and convincing evidence and was against the manifest weight of the evidence.

{¶ 14} Grandparents:

1. The trial court's granting of the Huron County Department of Job and Family Services' motion for permanent custody as an initial disposition pursuant to R.C. 2151.414(E)(1) and R.C. 2151.414(E)(2) was against the manifest weight of evidence and therefore in error.

2. The trial court's finding that permanent custody to the Huron County Department of Job and Family Services was in the best interest of the children was against the manifest weight of the evidence and therefore in error.

{¶ 15} Given the similarities among the manifest weight arguments raised in the foregoing assignments of error, we will address said assignments of error simultaneously.

## II.  Analysis

{¶ 16} In *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the United States Supreme Court noted that parents' interest in the care, custody,

and control of their children "is perhaps the oldest of the fundamental liberty interests recognized by this Court." The protection of the family unit has always been a vital concern of the courts. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

{¶ 17} Ohio courts have long held that "parents who are 'suitable' persons have a 'paramount' right to the custody of their minor children." *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). Therefore, parents "must be afforded every procedural and substantive protection the law allows." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991).

{¶ 18} Thus, a finding of inadequate parental care, supported by clear and convincing evidence, is a necessary predicate to terminating parental rights. "Before any court may consider whether a child's best interests may be served by permanent removal from his or her family, there must be first a demonstration that the parents are 'unfit.'" *In re Stacey S.*, 136 Ohio App.3d 503, 516, 737 N.E.2d 92 (6th Dist.1999), citing *Quillon v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). Parental unfitness is demonstrated by evidence sufficient to support findings pursuant to R.C. 2151.414. *See In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

{¶ 19} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*, 6th Dist. No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Nos. 03AP-1167, 03AP-1231, 2004-Ohio-3312, ¶ 28. In conducting a review on manifest

7.

weight, the reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17. We recognize that, as the trier of fact, the trial court is in the best position to weigh the evidence and evaluate the testimony. *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Thus, "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3, 461 N.E.2d 1273 (1984).

{¶ 20} In order to terminate parental rights and award permanent custody of a child to a public services agency under R.C. 2151.353(A)(4), the juvenile court must find, by clear and convincing evidence, two things: (1) that the children cannot be placed with one of their parents within a reasonable time or should not be placed with their parents under R.C. 2151.414(E), and (2) that permanent custody is in the best interests of the child under R.C. 2151.414(D)(1). Since appellants' assignments of error challenge the trial court's findings as to R.C. 2151.414(E) and (D), we will address these statutory sections in turn.

8.

## A. Juvenile Court's Application of R.C. 2151.414(E)

{¶ 21} In the case sub judice, the juvenile court found that the children could not and should not be placed with mother or father within a reasonable period of time under R.C. 2151.414(E). Specifically, the court found that R.C. 2151.414(E)(1) and (2) applied with respect to mother and father.

{¶ 22} R.C. 2151.414(E) provides, in relevant part:

In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and

repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code.

{¶ 23} Appellants assert that the juvenile court erred in issuing a finding under R.C. 2151.414(E)(1) where JFS requested permanent custody as an initial disposition. Further, appellants argue that the court's findings under R.C. 2151.414(E)(2) are against the manifest weight of the evidence.

{¶ 24} At the outset, we note that R.C. 2151.414(E) directs a juvenile court to enter a finding that the children cannot be placed with either parent within a reasonable

10.

time or should not be placed with either parent when *any* of the enumerated factors are found to be applicable. Thus, even if the juvenile court erred in concluding that R.C. 2151.414(E)(1) was applicable, its findings under R.C. 2151.414(E)(2) would be sufficient to support its conclusion that the children could not be placed with appellant within a reasonable time or should not be placed with appellant. *See In re Destiny C.*, 6th Dist. Lucas No. L-08-1147, 2008-Ohio-5292, ¶ 26 ("A proper finding of any one of the R.C. 2151.414(E) factors is sufficient to sustain a conclusion that the children cannot now, or in a reasonable time, be reunited.").

{¶ 25} Concerning the juvenile court's finding under R.C. 2151.414(E)(1), we previously held in *In re Destiny* that "when there is a new and independent complaint that requests an initial disposition of permanent custody, reliance on the R.C. 2151.414(E)(1) factor is error." *Id.* at ¶ 25. Therefore, to the extent that the trial court relied upon (E)(1), its determination is erroneous. However, the juvenile court also found that R.C. 2151.414(E)(2) is applicable in this case.

{¶ 26} Relevant to the court's determination of the applicability of R.C. 2151.414(E)(2), several witnesses testified at the dispositional hearing concerning mother's and father's drug addiction and chemical dependency. Specifically, evidence was presented that each parent consumed $100 to $150 of heroin per day in support of their habit. Indeed, mother and father have shown themselves capable of maintaining sobriety only while incarcerated according to the testimony presented. Notably, mother

11.

was previously ordered by the juvenile court to refrain from drug use and has relapsed several times since first becoming addicted to heroin sometime in late 2010 or early 2011.

{¶ 27} In light of the foregoing testimony presented at the hearing, we cannot say that it was against the manifest weight of the evidence for the juvenile court to conclude that mother and father suffer from chronic chemical dependency that is so severe that it makes them unable to provide an adequate permanent home at the present time, or within the next year.

### B. Best Interests of the Children Under R.C. 2151.414(D)(1)

{¶ 28} We now turn to the trial court's finding that a grant of permanent custody to JFS was in the children's best interests under R.C. 2151.414(D)(1).

{¶ 29} R.C.2151.414(D)(1) provides:

(D)(1) In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

12.

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

For the purposes of division (D)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

{¶ 30} Here, with regard to its consideration of the children's best interests, the juvenile court provided a detailed analysis as to each factor listed above. Upon

13.

examination of those factors, the court stated: "[T]he court finds clearly and convincingly that placing the children in the permanent custody of [JFS] would be in the children's best interest."

{¶ 31} Under R.C. 2151.414(D)(1)(a), the court found that the children had formed a "positive relationship" with each other and their foster caregivers. The court also noted the children's close relationship to the grandparents, but discounted that fact based upon the unsafe home environment provided by the grandparents, as well as their violation of prior court orders directing them not to allow mother and father access to the home.

{¶ 32} At the dispositional hearing, JFS elicited the testimony of Jodi Ohm, a licensed professional counselor who evaluated Q.A. and N.T. upon their placement into foster care. Ohm observed improvement in certain behavioral issues she diagnosed in Q.A. and N.T. during her time with them. She also testified that Q.A. "seems connected to [the foster caregivers]." This testimony was corroborated by the testimony of Chelsea Fuller, a caseworker for JFS. When asked about the children's progress while in foster care, Fuller stated that the children have formed a bond with their foster caregivers, and seem content to be residing in their foster home. Further, Fuller testified as to many behavioral improvements she witnessed in the children following their placement in foster care.

{¶ 33} The children's guardian ad litem, Mary Ann Lamb, also testified at the hearing, stating that the children were doing well in foster care. Lamb went on to opine

14.

that separating the children would not be in their best interest. Her testimony was supported by others at the hearing who believed the children should be kept together.

{¶ 34} Turning to R.C. 2151.414(D)(1)(b), the trial court found that N.T. desired to be returned to the grandparents, but noted Lamb's testimony that N.T. appeared happy with the foster caregivers. The wishes of the remaining children were not considered in light of their ages and maturity levels.

{¶ 35} Under R.C. 2151.414(D)(1)(c), the court accurately recited the fact that the children were initially placed into the temporary custody of JFS when L.T. was born addicted to opiates. Thereafter, custody of the children was awarded to grandparents. However, grandparents' custody had to be revoked in April 2015 when it was determined that grandparents' home was unfit for the children and that grandparents had violated the juvenile court's order directing them not to allow mother and father to reside in their home. Upon removal from grandparents' residence, the children were placed into foster care, where they remained up until the date of the dispositional hearing.

{¶ 36} Finally, the court considered the children's need for a legally secure permanent placement under R.C. 2151.414(D)(1)(d). In its estimation, the court found "no realistic hope for a legally secure placement for the children absent an order of permanent custody to [JFS]." The court based its conclusion on the fact that mother has been addicted to heroin for the past five years, and father will be incarcerated on felony drug offenses until spring 2017.

15.

{¶ 37} As noted above during our discussion of parents' chemical dependency, the evidence produced at the dispositional hearing established that mother and father consumed between $100 and $150 of heroin each day to feed their addiction. Further, mother was provided opportunities to rehabilitate herself in the past, to no avail. As to the grandparents, the record establishes that they are unwilling to protect the children from the scourges of drug addiction by allowing mother and father into the home in violation of the juvenile court's prior order. Further, the condition of the home suggests that grandparents are unable to provide a secure permanent placement for the children. Thus, we agree with the juvenile court that an award of permanent custody to JFS is the only viable option for ensuring the children are given a legally secure permanent placement.

{¶ 38} In light of the foregoing, we conclude that the juvenile court's determination that permanent custody was in the children's best interests was supported by clear and convincing evidence, and was not against the manifest weight of the evidence. Having previously determined that the juvenile court's finding under R.C. 2151.414(E)(2) was supported by the evidence produced at the hearing, we conclude that the court's grant of permanent custody to JFS was not against the manifest weight of the evidence.

{¶ 39} Accordingly, appellants' assignments of error are not well-taken.

16.

### III.  Conclusion

**{¶ 40}** The judgment of the Huron County Court of Common Pleas, Juvenile Division, is affirmed.  Costs are hereby assessed to appellants in accordance with App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J. _____

_____
JUDGE

Stephen A. Yarbrough, J. _____

_____

James D. Jensen, P.J. _____
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.